Filed 5/6/2021 2:48 PM
Craig Harrison
Combination Clerk
Kent County, Texas

Cause No. 1820

| | | |
|---|---|---|
| CLINT LONG, INDIVIDUALLY, AND | § | IN THE DISTRICT COURT |
| N/F OF C.L. | § | |
|    *Plaintiff,* | § | |
| | § | |
| v. | § | |
| | § | 39th JUDICIAL DISTRICT |
| JAYTON-GIRARD INDEPENDENT | § | |
| SCHOOL DISTRICT, and JOHNNY TUB, | § | |
| in his official capacity as | § | |
| SUPERINTENDENT OF JAYTON- | § | |
| GIRARD INDEPENDENT SCHOOL | § | |
| DISTRICT, and LYLE LACKEY, | § | KENT COUNTY, TEXAS |
|    *Defendants.* | § | |

## PLAINTIFFS' ORIGINAL PETITION and APPLICATION FOR TEMPORARY RESTRAINING ORDER AND INJUNCTION

COMES NOW Clint Long ("Long"), individually and as next friend of C.L., a minor (collectively "Plaintiffs"), to complain of Jayton-Girard ISD ("JGISD") and Johnny Tub ("Tub"), JGISD's superintendent (collectively "Defendants").

SHORT STATEMENT: C.L. has been excluded from attending in-person instruction in Jayton-Girard ISD because he refuses to comply with JGISD's mask policy, a policy adopted through an opaque process via a secret committee composed of unknown persons appointed in secret, with a secret schedule, secret agenda, and without published minutes, all in violation of the Texas Open Meetings Act. Because the mask policy was created by an illegal procedure, lacks a published scientific basis, and fails to properly weigh and account for risk to students, Plaintiffs ask it be declared unenforceable and void.

## I.   DISCOVERY CONTROL PLAN

1.    Plaintiff intends to conduct discovery in this cause under Level 3 of Rule 190 of the Texas Rules of Civil Procedure.

## II.   RULE 47 STATEMENT OF RELIEF

2.    The damages sought herein are within the court's jurisdictional limits.

3.    Plaintiff seeks monetary relief of $100,000 or less and a demand for judgment for all the other relief to which the Plaintiffs deem themselves entitled.

## III.   PARTIES

4.    Plaintiff Clint Long is a resident of Kent County and may be contacted through his attorney of record, the undersigned; Clint Long is also acting as next friend for minor C.L.

5.    Plaintiff C.L. is a minor resident of Kent County and may be contacted through his attorney of record, the undersigned.

6.    Defendant Jayton-Girard ISD is an Independent School District in Kent County, and may be served through its Superintendent, Johnny Tub, at Jayton-Girard ISD's main office, 700 Madison Ave, PO Box 168, Jayton, TX 79528.

7.    Defendant Johnny Tub is a resident of Kent County sued in his official capacity and may be served at JGISD's main office, 700 Madison Ave, Jayton, TX 79528, or wherever he may be found.

8.     Defendant Lyle Lackey, a JGISD official and resident of Kent County, may be served at JGISD's main office, 700 Madison Ave, Jayton, TX 79528, his home, 801 Clairemont, Jayton, TX 79528, or wherever he may be found. Lackey issued in his individual capacity as an *ultra vires* actor.

## IV.    JURISDICTION & VENUE

9.     The subject matter, claims, and damages sought in this case are within this Court's jurisdiction.

10.    Venue in Kent County is proper under TEX. CIV. PRAC. REM CODE § 15.002 et seq. as a substantial part, of the events – or omissions giving rise to the claim – occurred in Kent County. Additionally, Plaintiffs reside in Kent County.

## V.    FACTUAL BACKGROUND

### A. Jayton-Girard ISD developed a mask policy in secret.

11.    Jayton-Girard ISD ("JGISD") is a public school district with an enrollment of fewer than 200 students, serving Kent County, Texas.

12.    On March 2, 2021, Gov. Abbott ("Abbott") issued executive order GA-34 which, among other things, states: "[t]here are no COVID-19 related operating limits for any business or other establishment", and "no person may be required by any jurisdiction to wear or to mandate the wearing of a face covering." Exhibit 5.

13.    GA-34 rescinded executive order GA-29 which required that all Texans wear face coverings in public, though the order included exceptions. Ex. 5 and 6.

14.    On June 18, 2020, Jayton-Girard ISD school board minutes indicate that the JGISD board members discussed COVID-19 protocol, but do not mention any further action or creation of any committees to develop any mask policies or the school's reopening. Exh. 1.

15.    On July 17, 2020, Defendant sent a text message to all parents, with children enrolled in the Jayton-Girard ISD.  Exh 2. The text included an attachment labeled, "JGISD 2020-2021 Reopening Plan ('Plan')". Exh. 2a.

16.    Neither the process, nor the parties responsible for the creation of the plan, were specified anywhere in the Plan.  Exh 2.

17.    The Plan was not published anywhere on the Jayton-Girard ISD website, and remains unpublished to the present time. Exh 3.

18.    No policy based on the Plan was submitted for parents to sign. Exh 2.

19.    Jayton-Girard ISD reopened its school on August 13, 2020. Exh 2.

20.    The Plan includes detailed provisions regarding face coverings:

> • Faculty, staff, and students are required to wear a face covering when entering and exiting the building, and during passing periods.
>
>   o PK-2nd grade will be required to wear a face covering when entering or exiting the building.  Once in the classroom a face shield provided by the district will be worn during instruction time. Neck gaiters provided by the district will be worn during recess and PE time when students are in close contact.
>
>   o 3rd-12th grade will be allowed to wear their own choice of face covering when entering or exiting the building, in the classroom, and during the passing periods. Neck gaiters provided by the district will be worn during recess, PE time, and athletics when students are in close contact. Students may be asked by their teachers at times to wear a face shield instead of a mask for educational purposes.

Exh. 2a.

21.    The GJISD requirement for a face covering does not come with a
specification of what constitutes an acceptable face covering. Based on the
observations by Plaintiffs, acceptable face coverings include sheer material
providing no substantive barrier to COVID-19-laden breath. Nor does the policy
even require that the face covering be clean or occasionally washed.

22.    The Plan also includes a number of exemptions to the general mask
mandate, including:

> - We don't intend for the students to wear a face covering for the entire duration of a school day and faculty and staff will be looking for every opportunity to reduce the use of face coverings when other mitigating strategies can be met.
>
>   For example:
>
>   o  Face coverings are **NOT** required to be worn in the classroom when 6ft of social distancing is available. (teacher discretion)
>
>   o  Face coverings are **NOT** required when students are outside and are able to maintain 6ft of social distancing. (teacher & coach discretion)
>
>   o  Face coverings are **NOT** required when eating breakfast & lunch.

Exh. 2a.

23.    The Plan includes no exemptions based on disability, religion, or conscience.

24.    The Plan does specify that the mask policies are subject to revision based on
CDC, state, and local recommendations:

> *Our first priority is the safety of our students, employees, families, and surrounding community, and we strive to make the most responsible decisions to facilitate a safe environment for all. We would also like to emphasize that because of the fluid nature of this pandemic, CDC, state and local authority recommendations and mandates may be different on the first day of school than they are at the time of distribution of this information. We will adjust accordingly.*

Exh. 2a.

25.     On March 10, 2021, the Jayton-Girard ISD schoolboard considered a motion to continue current COVID-19 procedures that are in place. Exh 3.

26.     In March of 2021, the names of the committee members who authored the Plan were released to some parents, but not published anywhere on the Jayton-Girard ISD website or the public. Exh 2.

27.     The process by which the committee drafted the Plan remains unknown. Membership criteria regarding the committee remains opaque. Exh 2.

28.     On March 11, 2021, Clint Long took C.L., to Jayton-Girard ISD, but was prevented from entering by school official Lyle Lackey ("Lackey"). Exh 2.

29.     Long and Lackey exchanged greetings, but Lackey refused to allow Long and C.L. to go into the school without a mask. Exh 2.

30.     Long then inquired about religious exemptions, to which Lackey replied with an assertion that religious exemptions only apply to immunization. Exh 2.

31.     Ultimately, Plaintiff C.L. has been denied access to Jayton-Girard ISD, during the Spring 2021 term, due to his objection to mask wearing on religious and conscience grounds. Exh. 2.

32.     The JGISD, through its agents, has cited the mask policy as the grounds for C.L.'s exclusion. Exh. 2b.   Those refusing to wear a face covering must be banished to "virtual learning" – a system whereby students are confined to their

homes, separated from their peers, and their parents are compelled to leave their jobs if they want their children to have any semblance of public education.

33.    On April 20, 2021, the Jayton-Girard ISD schoolboard, for the first time in its minutes, acknowledged the existence of the secret COVID-19 reopening committee and adopted its recommendations.  Exh 7.

**B. COVID-19 transmission and health outcomes in children.**

34.    Defendants assume that no substantial costs result from mask requirements. However, compelling data suggests that Defendants' Pollyanna view of masking children borders on the Panglossian, as evidence mounts that school mask policies entail serious long-term consequences for vulnerable students' futures.

35.    In developing mask policies, decision-makers face three obvious questions in assessing the weight of evidence in favor of masking children:

    a.  First, how transmissible is COVID-19 among students?
    b.  Second, how transmissible is COVID-19 between students and teachers?
    c.  Third, how dangerous is COVID-19 to children?

36.    Answers to these questions are available thanks to teachers and school administrators across the nation working with the Nat'l Association of Elementary Schools and the Nat'l Association of Secondary School Principals, and data

scientists at the technology company Qualtrics, who have assessed the impact of COVID-19 and public policy responses to children in school environments.[1]

37.    Economics Professor Emily Oster[2] at Brown University's Watson Institute, leads Qualtrics' National COVID-19 School Response Dashboard. In that position, she oversees the data collection regarding school children and COVID-19 infection, and helps ensure accurate transmission of reliable data to the public.

38.    Writing for the Atlantic, in October, Professor Oster summarized the Project's findings during the height of the September second wave last year:

> Our data on almost 200,000 kids in 47 states from the last two weeks of September revealed an infection rate of 0.13 percent among students and 0.24 percent among staff. That's about 1.3 infections over two weeks in a school of 1,000 kids, or 2.2 infections over two weeks in a group of 1,000 staff. Even in high-risk areas of the country, the student rates were well under half a percent.[3]

39.    Oster then opined on the experience of Texas and its corroboration of Qualtrics' findings, writing:

> School-based data from other sources show similarly low rates. Texas reported 1,490 cases among students for the week ending on September 27, with 1,080,317 students estimated at school—a rate of about 0.14 percent. The staff rate was lower, about 0.10 percent.[4]

---

[1] National Covid-19 School Response Dashboard (Apr. 27, 2021 12:01 PM), https://statsiq.co1.qualtrics.com/public-dashboard/v0/dashboard/5f78e5d4de521a001036f78e#/dashboard/5f78e5d4de521a001036f78e?pageId=Page_f6071bf7-7db4-4a61-942f-ade4cce464de

[2] *Emily Oster*, Watson Institute International & Public Affairs (April 27, 2021 1:08 PM), https://watson.brown.edu/people/faculty/oster

[3] Emily Oster, *Schools Aren't Super-Spreaders*, The Atlantic (October 9, 2020), https://www.theatlantic.com/ideas/archive/2020/10/schools-arent-superspreaders/616669/.

[4] *Id.*

---

40.   International data further verifies the proposition that student-to-teacher COVID-19 transmission is rare. Martin Kulldorff, professor at Harvard Medical School summarized the findings of the Swedish Public Health Agency, "[they] found that teachers had the same risk of COVID as the average of other professions", the rate of infection among teachers in Sweden, was identical to Finland where schools *were closed*.[5]

41.   Regarding the third question asking about the danger posed to children by COVID-19, the CDC confirms that "[m]ost children with COVID-19 have mild symptoms or have no symptoms at all."[6] Specifically, the American Academy of Pediatrics notes that by the end of 2020 more than 2 million children had been diagnosed with COVID-19, and 172 had died for a case to fatality rate of 0.001%.[7] By contrast, the CDC reports that last year's notoriously mild flu season resulted in 188 confirmed child fatalities, with the CDC's estimate of actual child fatalities at closure to 600.[8]

---

[5] Alec MacGillis, *The Students Left Behind by Remote Learning*, ProPublica (September 28, 2020), https://www.propublica.org/article/the-students-left-behind-by-remote-learning.
[6] *COVID-19 in Children and Teens*, Centers for Disease Control (Apr. 27, 2021 11:06 AM), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/children/symptoms.html
[7] *Children and COVID-19: State-Level Data Report*, American Academy of Pediactrics (Apr. 27, 2021 11:07 AM), https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/
[8] *2019-20 Season's Pediatric Flu Deaths Tie High Mark Set During 2017-18 Season*, Centers for Disease Control and the National Center for Immunization and Respiratory Disease (Aug. 21, 2020), https://www.cdc.gov/flu/spotlights/2019-2020/2019-20-pediatric-flu-deaths.htm#:~:text=While%20any%20death%20in%20a.number%20was%20closer%20to%20600.

42.     Furthermore, COVID-19's child fatality rate is tame compared to the Spanish flue of 1918 which had a child fatality rate in the 5-14 age group of .0015.[9]

43.     Compared to recent flu seasons and the infamous Spanish flu of 1918, children's COVID-19 susceptibility and worst-case scenario outcomes are mild.

## C. Separate and Unequal: The deleterious impact of virtual education.

44.     On the cost side of the ledger, mandatory masking policies and digital learning policies tied thereto, have costs of their own that must be accounted in assessing the propriety and rationality of education policy.

45.     A study by the research based not-for-profit NWEA in partnership with researchers at Brown University and the University of Virginia, concluded that the average student could begin the current school year having lost as much as a third of the expected progress from the previous year in reading and half of the expected progress in math.[10]

46.     Compounding this problem, declines in educational attainment from distance learning are hitting the poorest and most vulnerable students the hardest. Analysis of the online math program, Zearn, by researchers at Harvard and Brown, found that transferring students online during the pandemic caused student progress in

---

[9] Luk, J., Gross, P., Thompson, W., (2001) Observations on Mortality during the 1918 Influenza Pandemic, Clinical Infectious Diseases, Vol 33, Issue 8, p. 1371-1378  https://academic.oup.com/cid/article/33/8/1375/347461.
[10] Kuhfeld, M., Soland, J., Tarasawa, B., Johnson, A., Ruzek, E., & Liu, J. (2020). Projecting the potential impacts of COVID-19 school closures on academic achievement. *Educational Researcher*. https://doi.org/10.3102/0013189X20965918.

math to decline *by nearly half* in classrooms located in low-income ZIP codes, and by *almost a third* in classrooms in middle-income ZIP codes, while math progress declines *were negligible* in high-income ZIP codes.[11]

47.     A comprehensive estimate by McKinsey & Company estimates that the average student has fallen seven months behind academically due to COVID-19, and black and Hispanic students are likely experiencing even more grievous losses of academic attainment - nine months for Latinos and ten for black children.[12]

48.     Children in rural districts have also been hit disproportionately hard by the pandemic. The New York Times[13] summarized findings of a report by the Center for Reinventing Public Education,[14] finding that, "[r]ural students have been especially cut off from their teachers. Only 27 percent of their districts required any instruction while schools were closed."

49.     A survey of 5,659 teachers engaged in online learning across the USA, by the professional networking app Fishbowl, found that among 34% of respondents,

---

[11] Raj Chetty, John N. Friedman, Nathaniel Hendren, Michael Stepner, and the Opportunity Insights Team, *Opportunity Insights Economic Tracker*, Harvard University and Brown University (Apr. 27, 2021 11:19 AM), https://tracktherecovery.org/.

[12] Emma Dorn, Bryan Hancock, Jimmy Sarakatsannis, and Ellen Viruleg, *COVID-19 and student learning in the United States: The hurt could last a lifetime*, McKinsey & Company (June 1, 2020), https://www.mckinsey.com/industries/public-and-social-sector/our-insights/covid-19-and-student-learning-in-the-united-states-the-hurt-could-last-a-lifetime#.

[13] Dana Goldstein, *Research Shows Students Falling Months Behind During virus Disruptions*, The New York Times (June 5, 2020), https://www.nytimes.com/2020/06/05/us/coronavirus-education-lost-learning.html.

[14] Betheny Gross and Alice Opalka, *Too Many Schools Leave Learning to Chance During the Pandemic*, Center for Reinventing Public Eeducation (June 2020), https://www.crpe.org/publications/too-many-schools-leave-learning-chance-during-pandemic.

no more than one in four students were attending remote classes, while most respondents disclosed that fewer than half their students were attending.[15]

50.    Researchers at the Massachusetts Institute of Technology's Teaching System Lab[16] identified three phenomena present in virtual learning that create a negative feedback loop in education, including:

     a.  Student Motivation: Teachers struggled to motivate their students through two layers of computer screens;

     b.  Professional Loss and Burnout: As they lost familiar means of teaching, teachers also lost a fundamental sense of their own efficacy and professional identity.

     c.  Exacerbated Inequities: The sense of loss grew deeper as teachers witnessed the dramatic intensification of the societal inequities that had always shaped their students' lives.

51.    The impact of virtual instruction, as a substitute to in-person learning has also catalyzed the emergence of documented negative health impacts on children. Alice Kuo[17], Professor of Child Health Policy, Chief of Medicine-Pediatrics and Director of the UCLA Center of Excellence in Maternal and Child Health and her

---

[15] Kyle McCarthy, *Covid-19 Survey: Teachers Say Less than Half of Students Attending their Remote Classes*, Fishbowl (April 13, 2020), https://www.fishbowlapp.com/insights/2020/04/13/covide-19-survey-teachers-say-less-than-half-of-students-attending-their-remote-classes/.

[16] Reich, Justin Reich et al., What's Lost, What's Left, What's Next: Lessons Learned from the Lived Experiences of Teachers during the 2020 Novel Coronavirus Pandemic, EdArXiv (Jul.22, 2020), https://edarxiv.org/8exp9.

[17] Alice Kuo and Casey Nagel, *Remote school is putting kids under toxic stress*, The Washington Post (August 10, 2020), https://www.washingtonpost.com/outlook/2020/08/10/remote-school-toxic-stress/.

coauthor Casey Nagel, writing in the Washington Post noted that many children have begun to suffer from "toxic stress" - the repeated and persistent activation of the body's fight-or-flight response. They link virtual schooling to an increase in the risk that this generation of children will suffer increased risks of heart disease and diabetes, reduced lifelong earning potential, and crippled mental health, all negative outcomes linked to toxic stress discussed as adverse childhood experiences in *The Lancet*, one of the world's premier medical journals.[18]

52.    Kuo and Nagel cite another *Lancet*[19] article to emphasize that formation of healthy physical and social habits along with inculcating a love of learning are critical for children and "integrally associated with lower chronic disease burden, higher economic earnings and increased overall life satisfaction, and every day out of a school is taking these things away from the children in our society."[20]

53.    Dr. Adrian James, President of the Royal College of Psychiatrists, echoed Kuo and Nagle sentiments, stating the pandemic "is going to have a profound effect on mental health" and "[i]t is probably the biggest hit to mental health since

---

[18] Karen Hughes, Mark A Bellis, Katherine A. Hardcastle, Dinesh Sethi, Alexander Butchart, Christopher Mikton, Lisa Jones, and Michael P Dunne, *The effect of multiple adverse childhood experiences on health: a systematic review and meta-analysis*, The Lancet (August, 2017), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(17)30118-4/fulltext.
[19] Mark A Bellis, Karen Hughes, Kat Ford, Gabriela Ramos Rodriguez, Dinesh Sethi, and Jonathon Passmore, *Life course health consequences and associated annual costs of adverse childhood experiences across Europe and North America: a systematic review and meta-analysis*, The Lancet (September 03, 2019), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(19)30145-8/fulltext.
[20] Alice Kuo and Casey Nagel, *Remote school is putting kids under toxic stress*, The Washington Post (August 10, 2020), https://www.washingtonpost.com/outlook/2020/08/10/remote-school-toxic-stress/.

the second world war. It does not stop when the virus is under control and there are few people in hospital. You've got to fund the long-term consequences."[21]

54.    Concerns over consistent damage to children's mental health are not limited to the passive effects of distance learning. School districts are actively contributing to stunting student's mental development.

55.    In an interview with the Texas Scorecard again from April of 2021, Dr. Sheri Tomak, PsyD, stated that, "Speaking as both a mom and a psychologist, the continued use of masks … does not appear warranted and is more of a detriment to our children." She went on to note that the mental damage school districts are inflicting on children through masking policies could lead to long term psychological conditions, including depression and anxiety.[22]

56.    Concerns regarding the health and safety of children in digital learning environments extend to isolation that leads to child abuse. James Dwyer, Arthur B. Hanson Chair at the William & Mary School of Law, states:

> We do have evidence of an impact on children's safety and physical well-being. There have been more severe cases of child abuse occurring and many children are suffering from a lack of access to food as a result of not attending school. We also have reason to

---

[21] Ian Sample, *Covid poses 'greatest threat to mental health since second world war'*, The Guardian (December 27, 2020), https://www.theguardian.com/society/2020/dec/27/covid-poses-greatest-threat-to-mental-health-since-second-world-war.
[22] Tera Collum, *Psychologist Has 'Significant Concerns' About Long-Term Effects of Masking Students*, Texas Scorecard (April 7, 2021), https://texasscorecard.com/state/psychologist-has-significant-concerns-about-long-term-effects-of-masking-students/.

suspect that there is more widespread maltreatment that has not been
showing up at the emergency room.[23]

57.    Harvard Law School Professor Elizabeth Bartholet, faculty director the HLS

Child Advocacy Program echoes these sentiments:

> I agree with Jim on the increased risk of child maltreatment, and I
> think it's important to think in terms of different categories of parents.
> One category consists of those who have been reported in the past for
> child abuse and neglect. These are the classic at-risk families. In the
> past, their children were being seen by teachers who are mandated to
> report any suspected abuse to child protection services. Those parents
> are now under the increased stress that goes with unemployment,
> isolation, and the related risks of drug and alcohol problems. So, kids
> that were already in danger are at more risk now and it's showing up
> in what the doctors are seeing in the emergency room, namely worse
> forms of injuries and higher death rates.
>
> And now there's a new category of parents with at-risk kids, those
> with no prior abuse history. A large proportion of all parents now are
> suffering extreme stresses related to COVID, including new concerns
> about their jobs, their housing, and their ability to feed their kids.
> Those stressors put the children at higher risk of maltreatment.[24]

58.    Margo Lindauer, director of the Domestic Violence Institute at Northeastern

University explains the mechanics of how keeping children out of school fosters

the circumstances in which abuse can occur. She writes, "[w]hat the data shows is

---

[23] Jeff Neal, *Will online schooling increase child abuse risks?*, Harvard Law Today (August 14, 2020),
https://today.law.harvard.edu/will-online-schooling-increase-child-abuse-risks/.
[24] Id.

that many child abuse and neglect reports come in through school; teachers, paraprofessionals, and nurses are mandated reporters."[25]

59.     She goes on to say, "In a non-pandemic world, [if] kids come in with a bruise, or they haven't been fed or bathed, or they have consistent injuries or pain, that potentially could be reported to a child welfare agency."[26]

60.     The Center for Disease Control has noted a "shift" in emergency room visits for child injuries consistent with domestic violence, during the pandemic and highlighted severity of child abuse-related injuries.[27]

61.     Virtual education of school children is not necessarily an anodyne policy. By creating physical separation between teachers and students, the principle social mechanism of accountability regarding child welfare, the symbiotic relationship between children, teachers, and parents is disrupted. The potential negative consequences, speak for themselves.

62.     In conclusion, mask policies that use banishment from school to deter dissenting parents and students are little more than a "join or die" policy

---

[25] Khalida Sarwari, *Closed Schools Could Be Putting Children At Risk During The Covid-19 Pandemic*, Northeastern University (October 23, 2020)https://news.northeastern.edu/2020/10/13/closed-schools-could-be-putting-children-at-risk-during-the-covid-19-pandemic/.
[26] Id.
[27] Elizabeth Swedo, Nimi Idaikkadar, Ruth Leemis, Taylor Dias, Lakshmi Radhakrishnan, Zachary Stein, May Chen, Nickolas Agathis, Kristin Holland, *Trends in U.S. Emergency Department Visits Related to Suspected or Confirmed Child Abuse and Neglect Among Children and Adolescents Aged <18 Years Before and During the COVID-19 Pandemic – United States, January 2019-September 2020*, Centers for Disease Control and Prevention (December 11, 2020) https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6949a1-H.pdf.

designed to force parents to accept unhealthful mask wearing or an inferior separate-but-equal style of educational isolation.

## VI.   CONDITIONS PRECEDENT

63.   All conditions precedent have been met.

## VII.   CAUSES OF ACTION

### A. Claim – ISD's mask policy violates the Texas Open Meetings Act.

64.   Secret meetings of government entities violate the Texas Open Meetings Act, found at sec. 551.002 of the Texas Government Code, which stipulates that "[e]very regular, special, or called meeting of a governmental body shall be open to the public…".

65.   Furthermore, sec. 551.021(a) requires that "[a] governmental body shall prepare and keep minutes, or make a recording, of each open meeting of the body."

66.   The Texas Supreme Court has held that, "[t]he Open Meetings Act generally provides that an action taken in violation of the Act is 'voidable'…", *Town of Shady Shores v. Swanson*, No. 18-0413, 63 Tex. Sup. Ct. J. 180, 2019 Tex. LEXIS 1213, at *19 (Dec. 13, 2019).

67.   In the Spring of 2020, JGISD created a School Reopening Committee, comprised of unknown members. The committee members' identities have been kept secret, until mid-March, and the minutes and policies of the committee are nowhere published.

68.    After a search on the JGISD website, no record could be found of any

minutes, at any meeting, that describe the adoption of the mask policy, or any

authorization of any committee assigned to develop this policy.

69.    Due to the absence of public record, regarding how and why the school

mask mandate was adopted, Defendants have failed to demonstrate that it is

predicated on a rigorous scientific and medical basis. Even the Governor's expired

mask mandates exempted children. Furthermore, the absence of public records

regarding the Plan drafting committee's meetings, prevents public scrutiny of any

evidence weighing against adoption of a mandate e.g., negative developmental

impacts on children, stemming from an inability to see teachers' faces.

70.    The lack of any transparency in the development of the mask policy is a

denial of the right to petition and flies in the face of every good government

practice adopted since the American Revolution.

## B. Claim--Defendants' mask policy unconstitutionally denies a free public education to C.L. under the Texas Constitution.

71.    The Texas Constitution, Article VII, section 1 states:

> SUPPORT AND MAINTENANCE OF SYSTEM OF PUBLIC FREE
> SCHOOLS. A general diffusion of knowledge being essential to the
> preservation of the liberties and rights of the people, it shall be the
> duty of the Legislature of the State to establish and make suitable
> provision for the support and maintenance of an efficient system of
> public free schools.

72.     Article VII, section 1 of the Texas Constitution confers the right on school children for a public free school. *Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 774 (Tex. 2005).

73.     To fulfill the constitutional obligation under the Texas Constitution, Article VII, section 1 to provide a general diffusion of knowledge, districts must provide all Texas children access to a quality education that reasonably enables them to achieve their potential and fully participate now and in the future in the social, economic, and educational opportunities of our state and nation. *Neeley v. W. Orange-Cove Consol. Indep. Sch. Dist.*, 176 S.W.3d 746, 787 (Tex. 2005) (citing Tex. Educ. Code §§ 4.001(a) and 28.001).

74.     Public schools in Texas may operate as provided by, and under the minimum standard health protocols found in, guidance issued by the Texas Education Agency ("TEA").

75.     Children and parents who object to the masking of minor children for extended periods of time, are presently compelled to rely on virtual learning in lieu of in-person instruction. As demonstrated above, virtual learning does not provide the same level of education as that received by those receiving classroom instruction. If it did, there would be no need for brick-and-mortar schools.

76.     Defendants' policy is irrational because it sentences children to an inferior mode of education based on their parents' convictions or the convictions of the

minors. Furthermore, the danger to students from COVID-19 and the danger to teachers is minimal.

77. Requiring mandatory face masking for all students fails the rational basis test and is clearly not in a child's best interest when assessed factually.

78. Furthermore, public schools in Texas may operate as provided by the minimum standard health protocols found in, guidance issued by TEA under Executive Order GA-32. The TEA Guidance offers "Operational Considerations" for the use of masks schools. The TEA Guidance states schools "should consider stringently applying recommended practices to adults on campuses, even when it might not be feasible to do so for students...." The TEA Guidance does not include any recommendation to discipline or remove students or parents who do not use personal protection equipment ("PPE") in school.

79. The TEA Guidance recommends that public school systems consult with their local public health authorities and local legal counsel before making final decisions regarding the implementation of this guidance. Kent County local public health authorities do not recommend, let alone require, students and parents to use PPE in school. Certainly, practices vary all over the state - Collin County local public health authorities require the discipline or removal of students or parents who do not use PPE in school, for example.

80.     Additionally, the mask policy includes no specification for mask construction, leading to farcical "masks" made of cheesecloth or other sheer fabric that no reasonable person would suggest deters COVID-19 spread.

81.     The GJISD mask policy is now little more than a game of compliance for its own sake, benefitting no one while those who point out that the emperor is naked are punished with a Kafkaesque banishment to home schooling.

### C. **Claim—The mask policy violates parental rights to determine their minor child's medical treatment.**

82.     The Defendants' mask policy that requires minors to wear masks, as is being done here, meets the definition of a medical device.[28] School mask mandates interfere with the parents' right to choose the medical decisions and treatments for their minor children; Texas law gives all parents the duty of providing medical and dental care to their children, and therefore, gives them the explicit right to consent to that treatment (including medical, dental, psychiatric, psychological, and surgical treatment). *See* Tex. Fam. Code §153.073(a)(3).

---

[28] According to the United States Food and Drug Agency, a face mask is a device, with or without a face shield, that covers the user's nose and mouth and may or may not meet fluid barrier or filtration efficiency levels. It includes cloth face coverings as a subset. It may be for single or multiple uses, and if for multiple uses it may be laundered or cleaned. There are many products marketed in the United States as "face masks" that offer a range of protection against potential health hazards. Face masks are regulated by FDA when they meet the definition of a "device" under section 201(h) of the Act. Generally, face masks fall within this definition when they are intended for a medical purpose. Face masks are regulated under 21 CFR 878.4040 as Class I 510(k)=exempt devise (non-surgical masks).

**D. Claim—Mandate violates the Equal Protection Clause and Due Process Clause of the Texas Constitution.**

83.    Article I, § 3 of the Texas Constitution states, "[a]ll free men, when they form a social compact, have equal rights, and no man, or set of men, is entitled to exclusive separate public emoluments or privileges, but in consideration of public services." The Defendants' mask order has the practical effect of treating similarly situated classes of students differently. The disparate and unequal treatment of these separate entities is not fully explained and has no rational basis.

84.    Equal Protection refers to the idea that a governmental body may not deny people equal protection of its governing laws. The state must treat an individual in the same manner as others in similar conditions and circumstances.

85.    Generally, a legislature may make distinctions among people for any proper purpose, as long as the distinction is rational. To pass the rational basis test, the school's policy must have a legitimate state interest, and there must be a rational connection between the policy's means and goals. There must be a logical relationship between the purpose of a law and any classification of people that it makes. Without this "rational basis," courts will strike challenged laws.

86.    Plaintiffs do not contend that the government has a compelling governmental interest in arresting the spread of COVID-19 in the general population. Nor do Plaintiffs maintain that masking in public spaces or even private homes, is inappropriate.

87.   Plaintiff's claim is narrow and precise. Plaintiffs' claim begins with recognition that this is not primarily a dispute about masks. Some parents will not permit their students to wear masks and some students will refuse to do so. In light of those facts, Defendants have sentenced these dissenters to virtual instruction, and the question before the court revolves around the propriety of that penal sanction.

88.   Plaintiff admits that although the state has a legitimate interest in mitigating the spread of COVID-19, blanket mask mandates in schools do not create a sufficient rational connection between policy's means and goals. Namely, the evidence that COVID-19 does not spread among students, or betwixt students and teachers, coupled with the documented adverse impacts of virtual instruction, militates against the notion that separate and unequal virtual education is the appropriate remedy the challenge schools face in balancing competing interpretations of adverse risks posed by the pandemic.

89.   Adding to these observations is the lack of any substantive mask specification. In the eyes of JGISD, all face coverings are sufficient to accomplish the goal of limiting COVID-19 spread, or at least good enough. But JGISD has no science to support that theory, as its administrators simply adopt the belief that every face covering is good and when challenged, assert that the practice has no cost and might help. But JGISD's "science" is little more a primitive man walking

out of his cave, noticing that the land in front of him is not obviously curved, and then pronouncing that the world is flat. Such a belief would not immediately harm him, but it would be wrong, and limit his culture's progress.

90.    Article I, § 319 of the Texas Constitution states, "[n]o citizen of this State shall be deprived of life, liberty, property, privileges or immunities, or in any manner disenfranchised, except by the due course of the law of the land."

91.    Defendants' mask policy punishes noncompliant students with virtual learning in place of in-person instruction. This is tantamount to an expulsion from the public school and has significant implications for families with work requirements who are unable to monitor their children during the workday.

92.    The Defendants' policy, perhaps best conceptualized as "expulsion with caveats", creates a situation where teachers must act as the mask police for children who lack the maturity level to comply with this policy on a long-term basis, hour after hour, day after day. As noted above, parents and teachers have been profoundly taxed by the exigencies of the pandemic and when children are sentenced to virtual instruction, the statistics leave no doubt that many children will slip through the cracks and suffer lasting harm to their educational advancement and even mental wellbeing.

93.    Virtual instruction violates the due process rights of the parents and their children because mandatory school masking does not provide a clear process

outlining why virtual learning is the appropriate sanction for an exercise of conscience regarding a risk assessment faced by our society.

94.     Reasonable people may differ on the balance the risk of COVID-19 transmission and potential damage to children of zealous pandemic mitigation. That difference in risk assessment is no grounds for denial of fundamental due process rights and the creation of a shadow underclass of undereducated students.

**E.  Claim--GJISD's mask mandate violates the Fourteenth Amendment.**

95.     The Fourteenth Amendment to the United States Constitution forbids the State to deprive any person of life, liberty, or property without due process of law. *Goss v. Lopez*, 419 U.S. 565, 572 (1975). When a state statute directs local authorities to provide a free education to all children and a compulsory-attendance law requires attendance for school, school children plainly have legitimate claims of entitlement to a public education. *Id.* at 573.

96.     Children do not shed their constitutional rights when they enter a school. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 506 (1969). "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures –Boards of Education not excepted." *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637 (1943).

97.     The State is constrained to recognize a student's legitimate entitlement to a public education as a property interest which is protected by the Due Process

Clause. *Goss* at 574; and see *New Braunfels Indep. Sch. Dist. v. Armke*, 658 S.W.2d 330, 332 (Tex.—Waco 1983, no writ.) (quoting *Goss v. Lopez*). The Due Process Clause also forbids arbitrary deprivations of liberty. *Id.*

98.    The Fourteenth Amendment to the U.S. Constitution guarantees equal protection. Here, similarly situated students, namely, students in school, are treated differently, due to uneven application and enforcement of the mask policy. Exh. 8.

99.    For example, students are not required to be masked during school plays, school photos, in close contact among players in school-sponsored football, or in the stands at school-sponsored sporting events. Exh. 8.

100.   Taken together, the photos attached in Exhibit 8 demonstrate that there is no consistent medically based enforcement of the ISD's mask policy. Instead, the photos show that a pattern of whimsical and haphazard enforcement of the mask mandate is applied to students, provided the wear it at the door.

101.   Because the mask policy is based on no science and is enforced unevenly, no reasonable person can defend GJISD's policy as anything other than an arbitrary deprivation of the right to disfavored student families to public education.

## F. Claim—Declaratory Judgment - the mask policy was enforced *ultra vires*.

102.   An ultra vires action requires a plaintiff to "allege and ultimately prove that the officer acted without legal authority or failed to perform a purely ministerial act." *See City of El Paso, v. Heinrich*, 284 S. W.3d 366, 372 (Tex. 2009). *See also Hall v. McRaven*, 508 S.W.3d 232, 243 (Tex. 2017).

103.   The Supreme Court of Texas defines "without legal authority" by holding, "a government officer with some discretion to interpret and apply a law my nonetheless act 'without legal authority,' and thus *ultra vires*, if he exceeds the bounds of his granted authority or if his acts conflict with the law itself." See *Hous. Belt & Terminal Ry. Co. v. City of Houston*, 487 S.W.3d 154, 158 (Tex. 2016).

104.   "Ministerial acts" are those, "where the law prescribes and denies the duties to be performed with such precision and certainty as to leave nothing to the exercise of discretion or judgment." *Sw. Bell Tel., L.P. v Emmett*, 459 S. W. 3d 578, 578 (Tex. 2015) (quoting *City of Lancaster v. Chambers*, 883 S. W.2d 650, 654 (Tex. 1994)).

105.   Here the superintendent Johnny Tub acted *illegally* by authorizing and aiding in the creation of an unlawful committee and substituted his medical judgment for that of parents and medical professionals.

106.   After GJISD adopted the mask policy illegally, Lyle Lacky acted *ultra vires* by barring C.L. from school without licit authority, due to the absence of any

properly adopted policy on which he could justifiably rely to bar a nonconforming student from school.

## VIII. **APPLICATION FOR TEMPORARY RESTRAINING ORDER**

107.   Plaintiff requests a temporary restraining order ("TRO"), to preserve the status quo, by preventing Defendants from enforcing their prohibition against non-mask wearing students entering school, and receiving in-person instruction, until the TRO is moot; the Court issues a temporary injunction, or the case can be adjudicated.

108.   The purpose of a TRO is to preserve the status quo, which the Supreme Court has defined as "the last, actual, peaceable, non-contested status which preceded the pending controversy." *In re Newton*, 146 S.W.3d 648, 651 (Tex. 2004) (cleaned up).

109.   A TRO restrains a party from acting, only during the pendency of motion for temporary injunction, i.e., until a full evidentiary hearing on the motion occurs. *Del Valle ISD v. Lopez*, 845 S.W.2d 808, 809 (Tex. 1992); see Tex. R. Civ. P. 680.

110.   Any TRO issued by a trial court must:

> "(1) [S]tate why the order was granted without notice if it is granted *ex parte*, (2) state the reasons for the issuance of the order by defining the injury and describing why it is irreparable, (3) state the date the order expires and set a hearing on a temporary injunction, and (4) set a bond."

*In re Office of the AG*, 257 S.W.3d 695, 697 (Tex. 2008) (cleaned up).

111.   The comparative injury, or balance of equities and hardships, to the parties and to the public interest, support granting a temporary restraining order; Plaintiff is only asking the Court to preserve the status quo and require the Defendants to cease from enforcing their prohibition, which is damaging Plaintiff's constitutional rights to a public education.

112.   There is no adequate remedy at law that will give C.L. full relief, because denial of in-person education should be addressed immediately. Each day, the Plaintiff suffers significant irreparable damage to his constitutional rights, to due process of law and education. C.L.'s total damages cannot be measured with certainty, and it is neither equitable, nor conscionable, to allow Defendants to violate C.L.'s constitutional rights.

113.   The loss of constitutional freedoms for, "even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Additionally, the loss of quality educational time can never be replaced.

114.   The harm to the Plaintiff, if this TRO is denied, will be significant and irreparable. If this Court allows the ISD to continue unchecked, C.L. faces the total loss of his right to a public education – of similar quality to his mask wearing peers – for no other reason than a secret policy, created by a secret and illegal committee.

115.   The Plaintiffs are entitled to a TRO, because Defendants can show no harm to the ISD, in granting the relief requested. Defendants violated the legal process

and the Texas Open Meetings Act. Enjoining an already illegal and unconstitutional policy does not cause harm to the Defendants.

116.   Therefore, Plaintiff respectfully requests that this Court issue a temporary restraining order against the Defendants – restraining them, their agents, representatives, employees, or anyone acting on their behalf, including teachers – until further order of the Court; and from taking any actions to enforce the mask policy outlined in the Plan, or any iteration thereof against C.L., including but not limited to, permitting C.L. access to school without a mask. The proposed TRO is attached as Exh. 6.

117.   Plaintiff requests that the TRO last for fourteen days from the issue date of the order, and then extending the TRO as necessary until the Court can consider an injunction.

118.   Because Plaintiff seeks a TRO, it must post a bond. Because the TRO is sought against a state entity, which will suffer no damage, Plaintiff requests that bond be set at $100.00.

## IX.   APPLICATION FOR TEMPORARY & PERMANENT INJUNCTION

119.   Similarly, Plaintiffs seek that this Court first temporarily enjoin, and then permanently enjoin the ISD, restraining it or anyone acting on its behalf, including teachers, from enforcing the mask policy outlined in the Plan; or any later iteration thereof against Plaintiff, including but not limited to, permitting C.L. access to school without a mask.

120.   Absent judicial intervention, Plaintiff faces ongoing requirements impacting his education, and has no practical ability to, again, prevent the ISD from further penalizing him, and continuing to provide an inequitable education.

121.   There is no adequate remedy at law that will give C.L. full relief, because denial of in-person education should be addressed immediately. Each day, the Plaintiff suffers significant irreparable damage to his constitutional rights, to due process of law and education. C.L.'s total damages cannot be measured with certainty, and it is neither equitable, nor conscionable, to allow Defendants to violate C.L.'s constitutional rights.

122.   The Court should note it is not necessary at the hearing for temporary injunction, for Plaintiffs to prove they will ultimately prevail, *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968) but only that Plaintiffs are entitled to the preservation of the status quo, pending trial. *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981).

123.   The comparative injury, or balance of equities and hardships, to the parties and to the public interest, support granting injunctive relief; the Plaintiff is only asking the Court to preserve the status quo and require Defendants to cease unlawfully infringing upon Plaintiff's constitutional rights – with a temporary, and then permanent injunction after trial.

## X.   JURY DEMAND

124.   Plaintiffs herewith tender the jury fee and request a jury trial.

## XI.   FINAL SUMMARY

125.   In sum, Plaintiff's do not challenge the medical efficacy of a proper medical mask used in a medical environment, the propriety of masking adults, the propriety of masking teachers, nor even, the propriety of voluntary masking of children with parental consent. Plaintiff's argument rests on the unimpeachable reality that mandatory masking of school-aged children is medically unnecessary, psychologically, and educationally harmful, and unjustified based on contemporary understanding of COVID-19 transmission among children. Specifically, Plaintiffs contend that Defendants' mandatory child masking policies violate the Texas Open Meetings Act in their inception, and violate the Texas Constitution and Federal Constitution's guarantees enshrining the civil right to free public education of the Fourteenth Amendment's Equal Protection and Due Process clauses by creating a bifurcated system of education where non-masking students are relegated to a

separate and unequal class of students who are sentenced to virtual learning in leu of in-person instruction. Plaintiffs further contend that less restrictive means of accomplishing the government's interest in arresting the spread of COVID-19 can be accomplished through employing social distancing, face shields, and vaccinations in schools and other prophylactic measures.

## XII.  **PRAYER**

Plaintiffs respectfully pray that the Defendants be cited to appear and answer, as required by law; and, after trial by jury, Plaintiffs be awarded judgment against Defendants, a Temporary Restraining Order, a Temporary Injunction, a Permanent Injunction, actual damages, and general damages; mental anguish; nominal damages in the alternative; reasonable and necessary attorney's fees, as damages in equity; pre-judgment and post-judgment interest; court costs, and exemplary damages; and all other relief to which Plaintiffs may be justly entitled, in both law and equity.

Respectfully submitted,

By: /s/ Warren V. Norred
Warren V. Norred,
Texas Bar No. 24045094
wnorred@norredlaw.com
515 E. Border; Arlington, Texas 76010
P: 817-704-3984; F: 817-524-6686
Attorney for Plaintiffs

**Exhibits:**
Exh 1. June 18, 2020, Jayton-Girard ISD Schoolboard Minutes
Exh. 2. Declaration of Clint Long
Exh. 2a JGISD 2020-2021 Reopening Plan
Exh. 2b Video of Denial of Entry
Exh 3. Proposed Temporary Restraining Order
Exh 4. GA-34
Exh 5. GA-29
Exh 6. April 20, 2021, Jayton-Girard ISD Schoolboard Minutes
Exh 7. School Photos

# APPENDIX

# Table of Contents

Exh. 1 - June 18, 2020 School Board Minutes   3

Exh. 2 - Long Declaration   5

    Exh. 2A - JGSID Reopening Plan   10

    Exh. 2B - Recording   20

Exh. 3 - Proposed TRO   20

Exh. 4 - EO GA-34   23

Exh. 5 - EO GA-29   29

Exh. 6 - JGISD April Minutes   35

Exh. 7 - School Photos   39

# EXHIBIT 1

Jayton-Girard Independent School District - June 18, 2020 – School Board
Meeting Minutes

**EXHIBIT 1**

The board of Trustees of the Jayton-Girard Independent School District met in regular session on June 18, 2020, with the following members present: to wit:

Amanda McGee-President

Kathy Owen                                              Connie Martinez
B.J. Baldridge                                           L'Rae Lee


**School Officials Present**: Trig Overbo-Superintendent, Lyle Lackey-Principal, Laci Scogin-Business Manager

**Visitors Present and their comments:**

And the following members absent: Cole Carpenter and Cody Stanaland

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order by President Amanda McGee at 7:02 pm.

Principal's report included scheduling, curriculum, summer training, Chromebook vs iPads, summer workouts, and Scholastic Network.

Superintendent's report included library relocation and surplus books, school housing repairs, school calendar, begin COVID-19 protocol talks, front entrance, day care/gym, paving, tennis courts, and school housing.

Minutes from the May 14, 2020 Regular Meeting and the June 1, 2020 Called Meeting were presented. Motion made by Kathy Owen, seconded by Connie Martinez to approve the minutes. All in favor.

The bills and financial report were presented. Motion made by L'Rae Lee, seconded by B.J. Baldridge to approve the bills as presented. All in favor.

Motion made by B.J. Baldridge, seconded by Connie Martinez to call for vehicle fuel and propane bids and to call for vendors for Personal Property valued between $10,000 and $25,000 for the 2020-2021 fiscal year. All in favor.

Motion made by Connie Martinez, seconded by B.J. Baldridge to approve the annual review of Investment Policies and Procedures as presented. All in favor.

Motion made by Kathy Owen, seconded by Connie Martinez to name Laci Scogin as the Investment Officer for Jayton-Girard ISD. All in favor.

Motion made by B.J. Baldridge, seconded by Kathy Owen to approve the request for County Permanent School Funds in the amount of $348,063.22 for capital improvements. All in favor.

No action taken on Depository Contract Extension with Bank of Texas. Current contract in effect until August 31, 2021.

Motion made by L'Rae Lee, seconded by B.J. Baldridge to approve missed school day waiver as presented. All in favor.

Motion made by Kathy Owen, seconded by B.J. Baldridge to accept bid from White River Youth Camp in the amount of $2,200 for the house located at 601 Jefferson pending proof of bond and insurance. All in favor.

**APPX. Pg. 4 of 67**

EXHIBIT 1

No action taken on Fund Balance Designation.

Next board meeting: July 21, 2020 at 7:00pm

Motion made by Connie Martinez, seconded by B.J. Baldridge to adjourn the meeting.  All in favor.

Meeting adjourned at 8:08 pm.


_____                    _____
President                                                              Secretary

# EXHIBIT 2

Declaration of Clint Long with Attached Exhibits

EXHIBIT 2

## Declaration (Tex. Civ. Prac. & Rem. Code § 132.001)

"My name is Clint Long, my date of birth is August 03rd, 1978 and my contact address is Box 243 Jayton, Tx. 79528. I declare under penalty of perjury that the following statements are true and correct."

1. I am a resident of Kent County Texas.

2. My son Carson Long attends school in the Jayton-Girard Independent School District.

3. On July 17th, the school district sent a text message to all parents, with children enrolled in Jayton-Girard ISD.

4. The text message included an attachment labeled, "JGISD 2020-2021 Reopening Plan. ("Plan" attached as Exhibit 2A).

5. Neither the process by which the Plan was created, nor the parties responsible for the creation of the plan were specified anywhere in the document.

6. I could not find the Plan anywhere on the Jayton-Girard ISD website, and I believe it is not published anywhere.

7. No forms were sent to parents to sign regarding the Plan.

8. Jayton-Girard ISD reopened school on August 13, 2020.

9. The Plan included detailed provisions regarding face coverings:

- Faculty, staff, and students are required to wear a face covering when entering and exiting the building, and during passing periods.

  - PK-2nd grade will be required to wear a face covering when entering or exiting the building. Once in the classroom a face shield provided by the district will be worn during instruction time. Neck gaiters provided by the district will be worn during recess and PE time when students are in close contact.

  - 3rd-12th grade will be allowed to wear their own choice of face covering when entering or exiting the building, in the classroom, and during the passing periods. Neck gaiters provided by the district will be worn during recess, PE time, and athletics when students are in close contact. Students may be asked by their teachers at times to wear a face shield instead of a mask for educational purposes.

**EXHIBIT 2**

10. The Plan also includes a number of exemptions to the general mask mandate, including:

- We don't intend for the students to wear a face covering for the entire duration of a school day and faculty and staff will be looking for every opportunity to reduce the use of face coverings when other mitigating strategies can be met.

  For example:

  o Face coverings are **NOT** required to be worn in the classroom when 6ft of social distancing is available. (teacher discretion)

  o Face coverings are **NOT** required when students are outside and are able to maintain 6ft of social distancing. (teacher & coach discretion)

  o Face coverings are **NOT** required when eating breakfast & lunch.

11. The Plan includes no exemptions based on disability, religion, or conscience.

12. The Plan does specify that the mask policies are subject to revision based on CDC, state, and local recommendations:

*Our first priority is the safety of our students, employees, families, and surrounding community, and we strive to make the most responsible decisions to facilitate a safe environment for all. We would also like to emphasize that because of the fluid nature of this pandemic, CDC, state and local authority recommendations and mandates may be different on the first day of school than they are at the time of distribution of this information. We will adjust accordingly.*

13. I requested a religious exemption from mask wearing from the school because I believe the basis for wearing masks is not true. My request was denied.

14. In March of 2021, the names of the committee members who authored the Plan were released to some parents, but were not published on Jayton-Girard ISD website.

15. However, the process by which the committee drafted the Plan remains unknown. Membership criteria regarding on the committee remains secret.

16. Carson has been denied access to Jayton-Girard ISD, during the Spring 2021 term due to my objection to mask wearing on religious and conscience grounds.

17. The ISD, through its agents, has cited the mask policy as the grounds for Carson's exclusion from school.

Declaration of Clint Long                                                                 Page 2

**EXHIBIT 2**

18. On March 11th, 2021, I approached to door to the school with my son but was stopped outside by a school official Lyle Lackey ("Recording" attached as Exhibit 2B).

19. We exchanged greetings, but I observed him blocking the door, so I asked "we're not coming in?"

20. I was then told that Carson had to wear a mask to enter.

21. When I asked him if he was going to deny us access without a mask, he said, "Yes."

22. When I asked about the religious exemption that we were claiming, he replied that administrative codes that referred to immunization exemptions based on religion did not apply to masks.

23. When I asked, "Either way, you're not going to accept religious exemptions?" he replied, that exemptions only apply to immunization.

24. Ultimately, my son was barred from entering school because he refused to comply with a mask policy based on a secretly created irrational school policy that has no basis and to which he had a sincerely held religious belief.

Executed in Kent County, Texas on April 16,, 2021

Clint Long

Declaration of Clint Long                                          Page 3

# EXHIBIT 2A

JGISD Reopening Plan

EXHIBIT 2A

# JGISD 2020-2021 REOPENING PLAN



***Our objective is to return to the social interaction of a connected learning environment while implementing reasonable measures for student and staff safety.***

*At JGISD, we are committed to a safe and complete return to school on August 13, 2020, and we are preparing to provide full in-person instruction. If you are not comfortable sending your child into the school building, then remote learning for PK-12th grades will be provided in compliance with TEA guidelines. We have been monitoring the spread of Covid-19 in Kent County and have created a plan that is reasonable and appropriate to do our part to stay healthy and provide a safe learning environment for all of our staff and students. The plans set forth are subject to change depending on future developments, but the following will allow us to return to the school environment we so deeply love and value.*

**JGISD 2020-2021 REOPENING PLAN**

# *Content Covered*

*01-- Daily Procedures*

*02-- Face Coverings*

*03-- Remote Learning Plan*

*04-- Cleaning Protocols*

*05--Distancing Guidelines & Supporting a Healthy Campus*

*06--Partial Closures & Plan Review*



# Executive Order

### BY THE
### GOVERNOR OF THE STATE OF TEXAS

**Executive Department**
**Austin, Texas**
**March 2, 2021**

### EXECUTIVE ORDER
### GA 34

*Relating to the opening of Texas in response to the COVID-19 disaster.*

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, in each subsequent month effective through today, I have renewed the disaster declaration for all Texas counties; and

WHEREAS, I have issued executive orders and suspensions of Texas laws in response to COVID-19, aimed at protecting the health and safety of Texans and ensuring an effective response to this disaster; and

WHEREAS, I issued Executive Order GA-08 on March 19, 2020, mandating social-distancing restrictions in accordance with guidelines promulgated by President Donald J. Trump and the Centers for Disease Control and Prevention (CDC); and

WHEREAS, I subsequently issued a series of superseding executive orders aiming to achieve the least restrictive means of combatting the evolving threat to public health by adjusting social-distancing restrictions while implementing a safe, strategic plan to reopen Texas; and

WHEREAS, under Executive Order GA-32, in effect since October 14, 2020, most establishments have been able to operate up to at least 75 percent of total occupancy, except in some areas with high hospitalizations as defined in that order, where most establishments have been able to operate up to at least 50 percent of total occupancy; and

WHEREAS, I also issued Executive Order GA-29, regarding the use of face coverings to control the spread of COVID-19, and a series of executive orders, most recently GA-31, limiting certain medical surgeries and procedures; and

WHEREAS, COVID-19 hospitalizations and the rate of new COVID-19 cases have steadily declined due to the millions of Texans who have voluntarily been vaccinated, many more who are otherwise immune, improved medical treatments for COVID-19 patients, abundant supplies of testing and personal protective equipment, and Texans' adherence to safe practices like social distancing, hand sanitizing, and use of face coverings; and

WHEREAS, in the Texas Disaster Act of 1975, the legislature charged the governor with the responsibility "for meeting ... the dangers to the state and people presented by

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
1:15 PM O'CLOCK

MAR 0 2 2021

EXHIBIT 4

*Governor Greg Abbott*                                        *Executive Order GA-34*
March 2, 2021                                                                    Page 2

disasters" under Section 418.011 of the Texas Government Code, and expressly granted the governor broad authority to fulfill that responsibility;

WHEREAS, under Section 418.012, the "governor may issue executive orders … hav[ing] the force and effect of law;"

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, and in accordance with guidance from medical advisors, do hereby order the following on a statewide basis effective at 12:01 a.m. on March 10, 2021:

1. In all counties not in an area with high hospitalizations as defined below:
   a. there are no COVID-19-related operating limits for any business or other establishment; and
   b. individuals are strongly encouraged to wear face coverings over the nose and mouth wherever it is not feasible to maintain six feet of social distancing from another person not in the same household, but no person may be required by any jurisdiction to wear or to mandate the wearing of a face covering.

   "Area with high hospitalizations" means any Trauma Service Area that has had seven consecutive days in which the number of COVID-19 hospitalized patients as a percentage of total hospital capacity exceeds 15 percent, until such time as the Trauma Service Area has seven consecutive days in which the number of COVID-19 hospitalized patients as a percentage of total hospital capacity is 15 percent or less. A current list of areas with high hospitalizations will be maintained at www.dshs.texas.gov/ga3031.

2. In any county located in an area with high hospitalizations as defined above:
   a. there are no state-imposed COVID-19-related operating limits for any business or other establishment;
   b. there is no state-imposed requirement to wear a face covering; and
   c. the county judge may use COVID-19-related mitigation strategies; *provided, however, that*:
      i. business and other establishments may not be required to operate at less than 50 percent of total occupancy, with no operating limits allowed to be imposed for religious services (including those conducted in churches, congregations, and houses of worship), public and private schools and institutions of higher education, and child-care services;
      ii. no jurisdiction may impose confinement in jail as a penalty for violating any order issued in response to COVID-19; and
      iii. no jurisdiction may impose a penalty of any kind for failure to wear a face covering or failure to mandate that customers or employees wear face coverings, except that a legally authorized official may act to enforce trespassing laws and remove violators at the request of a business establishment or other property owner.

3. In providing or obtaining services, every person (including individuals, businesses, and other legal entities) is strongly encouraged to use good-faith efforts and available resources to follow the Texas Department of State Health Services (DSHS) health recommendations, found at www.dshs.texas.gov/coronavirus.

4. Nothing in this executive order precludes businesses or other establishments from requiring employees or customers to follow additional hygiene measures, including the wearing of a face covering.

5. Nursing homes, state supported living centers, assisted living facilities, and long-

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
1:15 PM        O'CLOCK

MAR 0 2 2021

*Governor Greg Abbott*                          *Executive Order GA-34*
March 2, 2021                                    Page 3

    term care facilities should follow guidance from the Texas Health and Human Services Commission (HHSC) regarding visitations, and should follow infection control policies and practices set forth by HHSC, including minimizing the movement of staff between facilities whenever possible.

6. Public schools may operate as provided by, and under the minimum standard health protocols found in, guidance issued by the Texas Education Agency. Private schools and institutions of higher education are encouraged to establish similar standards.

7. County and municipal jails should follow guidance from the Texas Commission on Jail Standards regarding visitations.

8. Executive Orders GA-17, GA-25, GA-29, and GA-31 are rescinded in their entirety.

9. This executive order shall supersede any conflicting order issued by local officials in response to the COVID-19 disaster, but only to the extent that such a local order restricts services allowed by this executive order or allows gatherings restricted by this executive order. Pursuant to Section 418.016(a) of the Texas Government Code, I hereby suspend Sections 418.1015(b) and 418.108 of the Texas Government Code, Chapter 81, Subchapter E of the Texas Health and Safety Code, and any other relevant statutes, to the extent necessary to ensure that local officials do not impose restrictions in response to the COVID-19 disaster that are inconsistent with this executive order, provided that local officials may enforce this executive order as well as local restrictions that are consistent with this executive order.

10. All existing state executive orders relating to COVID-19 are amended to eliminate confinement in jail as an available penalty for violating the executive orders. To the extent any order issued by local officials in response to the COVID-19 disaster would allow confinement in jail as an available penalty for violating a COVID-19-related order, that order allowing confinement in jail is superseded, and I hereby suspend all relevant laws to the extent necessary to ensure that local officials do not confine people in jail for violating any executive order or local order issued in response to the COVID-19 disaster.

This executive order supersedes Executive Orders GA-17, GA-25, GA-29, GA-31, and GA-32, but does not supersede Executive Orders GA-10 or GA-13. This executive order shall remain in effect and in full force unless it is modified, amended, rescinded, or superseded by the governor. This executive order may also be amended by proclamation of the governor.

                                            Given under my hand this the 2nd day of March, 2021.

GREG ABBOTT
Governor

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
1:15pm O'CLOCK

MAR 0 2 2021

**EXHIBIT 5**

*Governor Greg Abbott*
March 2, 2021

*Executive Order GA-34*
Page 4

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_1:15 PM_ O'CLOCK

MAR 0 2 2021

**APPX. Pg. 29 of 67**

# EXHIBIT 5

Executive Order GA-29

EXHIBIT 9



G O V E R N O R   G R E G   A B B O T T

July 2, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30 ___ O'CLOCK

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas  78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

Executive Order No. GA-29 relating to the use of face coverings during the
COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

POST OFFICE BOX 12428 AUSTIN, TEXAS 78711 512-463-2000 (VOICE) DIAL 7-1-1 FOR RELAY SERVICES

EXHIBIT 3

# Executive Order

**BY THE**
**GOVERNOR OF THE STATE OF TEXAS**

**Executive Department**
**Austin, Texas**
**July 2, 2020**

**EXECUTIVE ORDER**
**GA 29**

*Relating to the use of face coverings during the COVID-19 disaster.*

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, in each subsequent month effective through today, I have renewed the disaster declaration for all Texas counties; and

WHEREAS, the Commissioner of the Texas Department of State Health Services (DSHS), Dr. John Hellerstedt, has determined that COVID-19 continues to represent a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, I have issued executive orders and suspensions of Texas laws in response to COVID-19, aimed at using the least restrictive means available to protect the health and safety of Texans and ensure an effective response to this disaster; and

WHEREAS, as Texas reopens in the midst of COVID-19, increased spread is to be expected, and the key to controlling the spread and keeping Texans safe is for all people to consistently follow good hygiene and social-distancing practices; and

WHEREAS, due to recent substantial increases in COVID-19 positive cases, and increases in the COVID-19 positivity rate and hospitalizations resulting from COVID-19, further measures are needed to achieve the least restrictive means for reducing the growing spread of COVID-19, and to avoid a need for more extreme measures; and

WHEREAS, I have joined the medical experts in consistently encouraging people to use face coverings, and health authorities have repeatedly emphasized that wearing face coverings is one of the most important and effective tools for reducing the spread of COVID-19; and

WHEREAS, given the current status of COVID-19 in Texas, requiring the use of face coverings is a targeted response that can combat the threat to public health using the least restrictive means, and if people follow this requirement, more extreme measures may be avoided; and

WHEREAS, wearing a face covering is important not only to protect oneself, but also to avoid unknowingly harming fellow Texans, especially given that many people who go into public may have COVID-19 without knowing it because they have no symptoms; and

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30pm O'CLOCK

JUL 0 2 2020

EXHIBIT 5

*Governor Greg Abbott*
July 2, 2020

*Executive Order GA-29*
Page 2

WHEREAS, the "governor is responsible for meeting ....the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and the legislature has given the governor broad authority to fulfill that responsibility; and

WHEREAS, failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable under Section 418.173 by fine;

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order the following on a statewide basis effective at 12:01 p.m. on July 3, 2020:

Every person in Texas shall wear a face covering over the nose and mouth when inside a commercial entity or other building or space open to the public, or when in an outdoor public space, wherever it is not feasible to maintain six feet of social distancing from another person not in the same household; *provided, however, that this face-covering requirement does not apply to the following*:

1. any person younger than 10 years of age;

2. any person with a medical condition or disability that prevents wearing a face covering;

3. any person while the person is consuming food or drink, or is seated at a restaurant to eat or drink;

4. any person while the person is (a) exercising outdoors or engaging in physical activity outdoors, and (b) maintaining a safe distance from other people not in the same household;

5. any person while the person is driving alone or with passengers who are part of the same household as the driver;

6. any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or a need for specific access to the face, such as while visiting a bank or while obtaining a personal-care service involving the face, but only to the extent necessary for the temporary removal;

7. any person while the person is in a swimming pool, lake, or similar body of water;

8. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

9. any person who is actively providing or obtaining access to religious worship, but wearing a face covering is strongly encouraged;

10. any person while the person is giving a speech for a broadcast or to an audience; or

11. any person in a county (a) that meets the requisite criteria promulgated by

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30 pm O'CLOCK

JUL 0 2 2020

EXHIBIT 5

the Texas Division of Emergency Management (TDEM) regarding minimal cases of COVID-19, and (b) whose county judge has affirmatively opted-out of this face-covering requirement by filing with TDEM the required face-covering attestation form—provided, however, that wearing a face covering is highly recommended, and every county is strongly encouraged to follow these face-covering standards.

Not excepted from this face-covering requirement is any person attending a protest or demonstration involving more than 10 people and who is not practicing safe social distancing of six feet from other people not in the same household.

TDEM shall maintain on its website a list of counties that are not subject to this face-covering requirement pursuant to paragraph number 11. The list can be found at: www.tdem.texas.gov/ga29.

Following a verbal or written warning for a first-time violator of this face-covering requirement, a person's second violation shall be punishable by a fine not to exceed $250. Each subsequent violation shall be punishable by a fine not to exceed $250 per violation.

Local law enforcement and other local officials, as appropriate, can and should enforce this executive order, Executive Order GA-28, and other effective executive orders, as well as local restrictions that are consistent with this executive order and other effective executive orders. But no law enforcement or other official may detain, arrest, or confine in jail any person for a violation of this executive order or for related non-violent, non-felony offenses that are predicated on a violation of this executive order; provided, however, that any official with authority to enforce this executive order may act to enforce trespassing laws and remove violators at the request of a business establishment or other property owner.

This executive order hereby prohibits confinement in jail as a penalty for the violation of any face-covering order by any jurisdiction.

Executive Order GA-28 is hereby amended to delete from paragraph number 15 the phrase: ", but no jurisdiction can impose a civil or criminal penalty for failure to wear a face covering."

The governor may by proclamation amend this executive order or add to the list of people to whom this face-covering requirement does not apply.

This executive order does not supersede Executive Orders GA-10, GA-13, GA-17, GA-19, GA-24, GA-25, GA-27, or GA-28 as amended. This executive order shall remain in effect and in full force until modified, amended, rescinded, or superseded by the governor.

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
__2:30ᵖᵐ__ O'CLOCK

JUL 0 2 2020

*Governor Greg Abbott*
July 2, 2020

*Executive Order GA-29*
Page 4



Given under my hand this the 2nd
day of July, 2020.

GREG ABBOTT
Governor

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30PM   O'CLOCK

JUL 0 2 2020

# EXHIBIT 6

Jayton-Girard Independent School District - April 20, 2021 - Schoolboard Minutes

**EXHIBIT 6**

The board of Trustees of the Jayton-Girard Independent School District met in regular session on April 20, 2021, with the following members present: to wit:

Amanda McGee – President

Jeff Arnold                                                           Connie Martinez
L'Rae Lee                                                            Cody Stanaland
B.J. Baldridge

**School Officials Present**: Johnny Tubb- Interim Superintendent, Lyle Lackey-Principal, Laci Scogin-Business Manager, Roger Smetak-Network Admin

**Visitors Present and their comments:** Layne Sheets

And the following members absent: Cole Carpenter

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order by Amanda McGee at 7:02 pm.

Principal's report included student success highlights, Big Event on April 28th, regional and state competitions, testing, rocket launching, and property survey.

Superintendent's report included accident report, 15-passenger van update, school housing update, main sewer line south of school, construction update.

Board President, Amanda McGee, called for closed session for personnel discussion at 7:06 pm. Returned to regular session at 7:22 pm.

Motion made by Jeff Arnold, seconded by Cody Stanaland to approve contract offering as Superintendent of Schools for the 2021-2022, 2022-2023, 2023-2024 school years for Layne Sheets. All in favor.

Minutes from March 22, 2021 Regular Meeting, March 23, 2021 Called Meeting, and March 29, 2021 Called Meeting were presented. Motion made by Cody Stanaland, seconded by B.J. Baldridge to approve the minutes as presented. All in favor.

The bills and financial report were presented. Motion made by Connie Martinez, seconded by B.J. Baldridge to approve and pay bills as presented. All in favor.

Motion made by Jeff Arnold, seconded by Cody Stanaland to approve budget amendments as presented. All in favor.

Motion made by Cody Stanaland, seconded by B.J. Baldridge to request for County Permanent School Funds in the amount of $367,792.31 for capital improvements. All in favor.

Motion made by Jeff Arnold, seconded by B.J. Baldridge to approve the amendment of the Child Care Center in the amount of $40,000.00. All in favor.

Preliminary budget projections were presented and discussed for 2021-2022 and 2022-2023 and no action was taken.

Motion made by Connie Martinez, seconded by Jeff Arnold to approve the purchase of the DW 3U Rack NVR (I-70 4MP), (10 Bay) i9 with 120 gig Solid State OS Drive Win 10 Pro with 9:12TB storage drives which is over $10,000. All in favor.

Motion made by B.J. Baldridge, seconded by L'Rae Lee to approve the resolution extending depository contract for

**APPX. Pg. 37 of 67**

**EXHIBIT 6**

funds.  5-for, Amanda-Abstained.

Information given to board about Summer Leadership Institute. No action taken.

Board President, Amanda McGee, called for closed session for attorney consult at 8:53 pm.  Returned to regular session at 9:31 pm.

Motion made by Cody Stanaland, seconded by Jeff Arnold to approve COVID policies and procedures as recommended by Committee and administration.  All in favor.

Called Meeting to canvas school board election votes on May 6th at 12:00 pm.  Regular board meeting date is set for May 17, 2021 at 8:00 pm.

Motion made by Connie Martinez, seconded by B.J. Baldridge to adjourn the meeting.  All in favor.

Meeting adjourned at 9:40 pm.

_____                    _____
President                                                                        Secretary

# EXHIBIT 7

School Photos











Double J Chronicles