**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF TEXAS - LUBBOCK DIVISION**

| | | |
|---|---|---|
| **CLINT LONG, individually, and next** | § | |
| **friend of C.L.** | § | |
|     Plaintiffs, | § | |
| | § | |
| **v.** | § | |
| | § | **No. 5:21-CV-111-H** |
| **JAYTON-GIRARD INDEPENDENT** | § | |
| **SCHOOL DISTRICT, ET AL.,** | § | |
|     Defendants. | § | |

**PLAINTIFFS' FIRST AMENDED COMPLAINT,**
**APPLICATION FOR PRELIMINARY INJUNCTION, TEMPORARY &**
**PERMANENT INJUNCTION**

COMES NOW Clint Long ("Long"), individually and as next friend of C.L., a minor (collectively "Plaintiffs"), to complain of Jayton-Girard ISD ("JGISD"), regarding an illegally established mask policy that has violated C.L.'s rights.

C.L. has been excluded from attending in-person instruction in JGISD because he refuses to comply with JGISD's mask policy, a policy adopted through an illegal process via a secret committee composed of unknown persons appointed in secret, with a secret schedule, secret agenda, and without published minutes, all in violation of the Texas Open Meetings Act. Then the ISD enforces the illegal Mask Policy unequally and fails to properly weigh risk to students, Plaintiff ask it to be declared unenforceable and void. Plaintiffs bring this action pursuant to 42 U.S.C § 1983 and the Texas Open Meetings Act.

# I.    PARTIES

1.    Plaintiff Clint Long is a resident of Kent County and may be contacted through his attorney of record, the undersigned; Clint Long is also acting as next friend for minor C.L.

2.    Plaintiff C.L. is a minor resident of Kent County and may be contacted through his attorney of record, the undersigned.

3.    Defendant Jayton-Girard ISD is an Independent School District in Kent County, and may be served through its Superintendent, Johnny Tub, at Jayton-Girard ISD's main office, 700 Madison Ave, PO Box 168, Jayton, TX 79528.

4.    Johnny Tub Lyle Moseley was a previous defendant dismissed by the filing of this First Amended Complaint.

5.    Lyle Lackey, a JGISD official was a previous defendant dismissed by the filing of this First Amended Complaint.

# II.    JURISDICTION & VENUE

6.    This Court has original jurisdiction of all civil actions arising under the laws of the United States. 28 U.S.C. § 1331. This civil action raises a federal question for which this Court has original jurisdiction. This Court has jurisdiction over Plaintiff's entire action pursuant to 28 U.S.C. §§ 1441 and 1367.

7.     Venue in Kent County is proper under 28 U.S.C. § 1391 as a substantial part, of the events – or omissions giving rise to the claim – occurred in Kent County. Additionally, Plaintiffs and Defendants reside in Kent County.

### III.     FACTUAL BACKGROUND

**A. <u>Jayton-Girard ISD developed a mask policy in secret.</u>**

8.     Jayton-Girard ISD ("JGISD") is a public school district with an enrollment of fewer than 200 students, serving Kent County, Texas.

9.     On March 2, 2021, Gov. Abbott ("Abbott") issued executive order GA-34 which, among other things, states: "[t]here are no COVID-19 related operating limits for any business or other establishment", and "no person may be required by any jurisdiction to wear or to mandate the wearing of a face covering." Exhibit. 5.

10.     GA-34 rescinded executive order GA-29 which required that all Texans wear face coverings in public, though the order included exceptions for children under 10 years old. Ex. 5 and 6.

11.     On June 18, 2020, Jayton-Girard ISD school board minutes indicate that the JGISD board members discussed COVID-19 protocol, but do not mention any further action or creation of any committees to develop any mask policies or the school's reopening. Exh. 1.

12.    On July 17, 2020, Defendant sent a text message to all parents, with children enrolled in the Jayton-Girard ISD.  Exh 2. The text included an attachment labeled, "JGISD 2020-2021 Reopening Plan" ("Plan")("Mask Policy") Exh. 2a.

13.    Neither the process, nor the parties responsible for the creation of the Plan, were specified anywhere in the Plan.  Exh 2.

14.    The Plan was not published anywhere on the Jayton-Girard ISD website after its creation and remains unpublished to the present time. Exh 2.[1]

15.    No policy based on the Plan was submitted for parents to sign. Exh 2.

16.    Jayton-Girard ISD reopened its school on August 13, 2020. Exh 2.

17.    The Plan includes detailed provisions regarding face coverings:

- Faculty, staff, and students are required to wear a face covering when entering and exiting the building, and during passing periods.
    - PK-2nd grade will be required to wear a face covering when entering or exiting the building.  Once in the classroom a face shield provided by the district will be worn during instruction time. Neck gaiters provided by the district will be worn during recess and PE time when students are in close contact.
    - 3rd-12th grade will be allowed to wear their own choice of face covering when entering or exiting the building, in the classroom, and during the passing periods. Neck gaiters provided by the district will be worn during recess, PE time, and athletics when students are in close contact. Students may be asked by their teachers at times to wear a face shield instead of a mask for educational purposes.

Exh. 2a.

---

[1] Defendants did provide a link to the document in their Motion to Dismiss [ECF Doc. 10-1, pg. 4], however there has been no evidence that it was published on their website during the time of its original publishing in the summer of 2020.

18.    The JGISD requirement for a face covering does not come with a specification of what constitutes an acceptable face covering. Based on the observations by Plaintiffs, acceptable face coverings include sheer material providing no substantive barrier to COVID-19-laden breath. Nor does the policy even require that the face covering be clean or occasionally washed.

19.    The Plan also includes a number of times when masks are not required:

> • We don't intend for the students to wear a face covering for the entire duration of a school day and faculty and staff will be looking for every opportunity to reduce the use of face coverings when other mitigating strategies can be met.
>
> For example:
>
> o Face coverings are **NOT** required to be worn in the classroom when 6ft of social distancing is available. (teacher discretion)
>
> o Face coverings are **NOT** required when students are outside and are able to maintain 6ft of social distancing. (teacher & coach discretion)
>
> o Face coverings are **NOT** required when eating breakfast & lunch.

Exh. 2a.

20.    The Plan includes no exemptions based on age, disability, religion, or conscience.

21.    The Plan does specify that the mask policies are subject to revision based on CDC, state, and local recommendations:

> *Our first priority is the safety of our students, employees, families, and surrounding community, and we strive to make the most responsible decisions to facilitate a safe environment for all. We would also like to emphasize that because of the fluid nature of this pandemic, CDC, state and local authority recommendations and mandates may be different on the first day of school than they are at the time of distribution of this information. We will adjust accordingly.*

Exh. 2a.

22.     On March 10, 2021, the Jayton-Girard ISD schoolboard considered a motion to continue current COVID-19 procedures that are in place. Exh 7.

23.     In March of 2021, the names of the committee members who authored the Plan were released to some parents, but not published anywhere on the Jayton-Girard ISD website or the public. Exh 2.

24.     The process by which the committee drafted the Plan remains unknown. Membership criteria regarding the committee remains opaque. Exh 2.

25.     On March 11, 2021, Clint Long took C.L., to Jayton-Girard ISD, but C.L. was prevented from entering by school official Lyle Lackey ("Lackey"). Exh 2.

26.     Long and Lackey exchanged greetings, but Lackey refused to allow Long and C.L. to go into the school without a mask. Exh 2.

27.     Long then inquired about religious exemptions, to which Lackey replied with an assertion that religious exemptions only apply to immunization. Exh 2.

28.     Ultimately, Plaintiff C.L. has been denied physical access to Jayton-Girard ISD, during the Spring 2021 term, due to his objection to mask requirements on religious and conscience grounds. Exh. 2.

29.     The JGISD, through its agents, has cited the Mask Policy as the grounds for C.L.'s exclusion. Exh. 2b. Those refusing to wear a face covering must be banished to "virtual learning" – a system whereby students are confined to their homes, separated from their peers, and their parents are compelled to leave their

jobs and act as drafted unpaid substitute teachers for JGISD if they want their children to receive an education.

30.     On April 20, 2021, the Jayton-Girard ISD schoolboard, for the first time in its minutes, acknowledged the existence of the secret COVID-19 reopening committee and adopted its recommendations.  Exh 5.

31.     Throughout the school year, JGISD held sports games and other school approved events that did not include social distancing or enforcing of the Mask Policy. Exhibits 2, 7.

**B.  COVID-19 transmission and health outcomes in children.**

32.     Defendants assume that no substantial costs result from mask requirements. However, compelling data suggests that Defendants' Pollyanna view of masking children borders on the Panglossian, as evidence mounts that school mask policies entail serious long-term consequences for vulnerable students' futures.

33.     In developing mask policies, decision-makers face three obvious questions in assessing the weight of evidence in favor of masking children:

     a.  First, how transmissible is COVID-19 among students?

     b.  Second, how transmissible is COVID-19 between students and teachers?

     c.   Third, how dangerous is COVID-19 to children?

34.     Answers to these questions are available thanks to teachers and school administrators across the nation working with the Nat'l Association of Elementary

Schools and the Nat'l Association of Secondary School Principals, and data scientists at the technology company Qualtrics, who have assessed the impact of COVID-19 and public policy responses to children in school environments.[2]

35.    Economics Professor Emily Oster[3] at Brown University's Watson Institute, leads Qualtrics' National COVID-19 School Response Dashboard. In that position, she oversees the data collection regarding school children and COVID-19 infection, and helps ensure accurate transmission of reliable data to the public.

36.    Writing for the Atlantic, in October, Professor Oster summarized the Project's findings during the height of the September second wave last year:

> Our data on almost 200,000 kids in 47 states from the last two weeks of September revealed an infection rate of 0.13 percent among students and 0.24 percent among staff. That's about 1.3 infections over two weeks in a school of 1,000 kids, or 2.2 infections over two weeks in a group of 1,000 staff. Even in high-risk areas of the country, the student rates were well under half a percent.[4]

37.    Oster then opined on the experience of Texas and its corroboration of Qualtrics' findings, writing:

> School-based data from other sources show similarly low rates. Texas reported 1,490 cases among students for the week ending on September 27, with 1,080,317 students estimated at school—a rate of about 0.14 percent. The staff rate was lower, about 0.10 percent.[5]

---

[2] National Covid-19 School Response Dashboard (Apr. 27, 2021 12:01 PM), https://statsiq.co1.qualtrics.com/public-dashboard/v0/dashboard/5f78e5d4de521a001036f78e#/dashboard/5f78e5d4de521a001036f78e?pageId=Page_f6071bf7-7db4-4a61-942f-ade4cce464de

[3] *Emily Oster*, Watson Institute International & Public Affairs (April 27, 2021 1:08 PM), https://watson.brown.edu/people/faculty/oster

[4] Emily Oster, *Schools Aren't Super-Spreaders*, The Atlantic (October 9, 2020), https://www.theatlantic.com/ideas/archive/2020/10/schools-arent-superspreaders/616669/.

[5] *Id.*

38.     International data further verifies the proposition that student-to-teacher COVID-19 transmission is rare. Martin Kulldorff, professor at Harvard Medical School, summarized the findings of the Swedish Public Health Agency, "[they] found that teachers had the same risk of COVID as the average of other professions." The observation made by those studying this issue included noted that the rate of infection among teachers in Sweden with most schools open was no greater to Finland, where schools *were closed*.[6]

39.     Regarding the third question asking about the danger posed to children by COVID-19, the CDC confirms that "[m]ost children with COVID-19 have mild symptoms or have no symptoms at all."[7] Specifically, the American Academy of Pediatrics notes that by the end of 2020 more than 2 million children had been diagnosed with COVID-19, and 172 had died for a case to fatality rate of 0.001%.[8] By contrast, the CDC reports that last year's notoriously mild flu season resulted in 188 confirmed child fatalities, with the CDC's estimate of actual child fatalities at closure to 600.[9]

---

[6] Alec MacGillis, *The Students Left Behind by Remote Learning*, ProPublica (September 28, 2020), https://www.propublica.org/article/the-students-left-behind-by-remote-learning.
[7] *COVID-19 in Children and Teens*, Centers for Disease Control (Apr. 27, 2021 11:06 AM), https://www.cdc.gov/coronavirus/2019-ncov/daily-life-coping/children/symptoms.html
[8] *Children and COVID-19: State-Level Data Report*, American Academy of Pediactrics (Apr. 27, 2021 11:07 AM), https://services.aap.org/en/pages/2019-novel-coronavirus-covid-19-infections/children-and-covid-19-state-level-data-report/
[9] *2019-20 Season's Pediatric Flu Deaths Tie High Mark Set During 2017-18 Season*, Centers for Disease Control and the National Center for Immunization and Respiratory Disease (Aug. 21, 2020), https://www.cdc.gov/flu/spotlights/2019-2020/2019-20-pediatric-flu-deaths.htm#:~:text=While%20any%20death%20in%20a,number%20was%20closer%20to%20600.

40.     Further, COVID-19's child fatality rate is tame compared to the Spanish flue of 1918 which had a child fatality rate in the 5-14 age group of .0015.[10]

41.     Compared to recent flu seasons and the infamous Spanish flu of 1918, children's COVID-19 susceptibility and worst-case scenario outcomes are mild.

## C. Separate and Unequal: The deleterious impact of virtual education.

42.     On the cost side of the ledger, mandatory masking policies and digital learning policies tied thereto, have costs of their own that must be accounted in assessing the propriety and rationality of education policy.

43.     A study by the research based not-for-profit NWEA in partnership with researchers at Brown University and the University of Virginia, concluded that the average student could begin the current school year having lost as much as a third of the expected progress from the previous year in reading and half of the expected progress in math.[11]

44.     Compounding this problem, declines in educational attainment from distance learning are hitting the poorest and most vulnerable students the hardest. Analysis of the online math program, Zearn, by researchers at Harvard and Brown, found that transferring students online during the pandemic caused student progress in

---

[10] Luk, J., Gross, P., Thompson, W., (2001) Observations on Mortality during the 1918 Influenza Pandemic, Clinical Infectious Diseases, Vol 33, Issue 8, p. 1371-1378  https://academic.oup.com/cid/article/33/8/1375/347461.

[11] Kuhfeld, M., Soland, J., Tarasawa, B., Johnson, A., Ruzek, E., & Liu, J. (2020). Projecting the potential impacts of COVID-19 school closures on academic achievement. *Educational Researcher*. https://doi.org/10.3102/0013189X20965918.

math to decline *by nearly half* in classrooms located in low-income ZIP codes, and by *almost a third* in classrooms in middle-income ZIP codes, while math progress declines *were negligible* in high-income ZIP codes.[12]

45.    A comprehensive estimate by McKinsey & Company estimates that the average student has fallen seven months behind academically due to COVID-19, and black and Hispanic students are likely experiencing even more grievous losses of academic attainment - nine months for Latinos and ten for black children.[13]

46.    Children in rural districts have also been hit disproportionately hard by the pandemic. The New York Times[14] summarized findings of a report by the Center for Reinventing Public Education,[15] finding that, "[r]ural students have been especially cut off from their teachers. Only 27 percent of their districts required any instruction while schools were closed."

47.    A survey of 5,659 teachers engaged in online learning across the USA, by the professional networking app Fishbowl, found that among 34% of respondents,

---

[12] Raj Chetty, John N. Friedman, Nathaniel Hendren, Michael Stepner, and the Opportunity Insights Team, *Opportunity Insights Economic Tracker*, Harvard University and Brown University (Apr. 27, 2021 11:19 AM), https://tracktherecovery.org/.
[13] Emma Dorn, Bryan Hancock, Jimmy Sarakatsannis, and Ellen Viruleg, *COVID-19 and student learning in the United States: The hurt could last a lifetime*, McKinsey & Company (June 1, 2020), https://www.mckinsey.com/industries/public-and-social-sector/our-insights/covid-19-and-student-learning-in-the-united-states-the-hurt-could-last-a-lifetime#.
[14] Dana Goldstein, *Research Shows Students Falling Months Behind During virus Disruptions*, The New York Times (June 5, 2020), https://www.nytimes.com/2020/06/05/us/coronavirus-education-lost-learning.html.
[15] Betheny Gross and Alice Opalka, *Too Many Schools Leave Learning to Chance During the Pandemic*, Center for Reinventing Public Eeducation (June 2020), https://www.crpe.org/publications/too-many-schools-leave-learning-chance-during-pandemic.

no more than one in four students were attending remote classes, while most respondents disclosed that fewer than half their students were attending.[16]

48.     Researchers at the Massachusetts Institute of Technology's Teaching System Lab[17] identified three phenomena present in virtual learning that create a negative feedback loop in education, including:

a.  Student Motivation: Teachers struggled to motivate their students through two layers of computer screens;

b.  Professional Loss and Burnout: As they lost familiar means of teaching, teachers also lost a fundamental sense of their own efficacy and professional identity.

c.  Exacerbated Inequities: The sense of loss grew deeper as teachers witnessed the dramatic intensification of the societal inequities that had always shaped their students' lives.

49.     The impact of virtual instruction, as a substitute to in-person learning has also catalyzed the emergence of documented negative health impacts on children. Alice Kuo[18], Professor of Child Health Policy, Chief of Medicine-Pediatrics and Director of the UCLA Center of Excellence in Maternal and Child Health and her

---

[16] Kyle McCarthy, *Covid-19 Survey: Teachers Say Less than Half of Students Attending their Remote Classes*, Fishbowl (April 13, 2020), https://www.fishbowlapp.com/insights/2020/04/13/covide-19-survey-teachers-say-less-than-half-of-students-attending-their-remote-classes/.

[17] Reich, Justin Reich et al., What's Lost, What's Left, What's Next: Lessons Learned from the Lived Experiences of Teachers during the 2020 Novel Coronavirus Pandemic, EdArXiv (Jul.22, 2020), https://edarxiv.org/8exp9.

[18] Alice Kuo and Casey Nagel, *Remote school is putting kids under toxic stress*, The Washington Post (August 10, 2020), https://www.washingtonpost.com/outlook/2020/08/10/remote-school-toxic-stress/.

coauthor Casey Nagel, writing in the Washington Post noted that many children have begun to suffer from "toxic stress" - the repeated and persistent activation of the body's fight-or-flight response. They link virtual schooling to an increase in the risk that this generation of children will suffer increased risks of heart disease and diabetes, reduced lifelong earning potential, and crippled mental health, all negative outcomes linked to toxic stress discussed as adverse childhood experiences in *The Lancet*, one of the world's premier medical journals.[19]

50.     Kuo and Nagel cite another *Lancet*[20] article to emphasize that formation of healthy physical and social habits along with inculcating a love of learning are critical for children and "integrally associated with lower chronic disease burden, higher economic earnings and increased overall life satisfaction, and every day out of a school is taking these things away from the children in our society."[21]

51.     Dr. Adrian James, President of the Royal College of Psychiatrists, echoed Kuo and Nagle sentiments, stating the pandemic "is going to have a profound effect on mental health" and "[i]t is probably the biggest hit to mental health since

---

[19] Karen Hughes, Mark A Bellis, Katherine A. Hardcastle, Dinesh Sethi, Alexander Butchart, Christopher Mikton, Lisa Jones, and Michael P Dunne, *The effect of multiple adverse childhood experiences on health: a systematic review and meta-analysis*, The Lancet (August, 2017), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(17)30118-4/fulltext.

[20] Mark A Bellis, Karen Hughes, Kat Ford, Gabriela Ramos Rodriguez, Dinesh Sethi, and Jonathon Passmore, *Life course health consequences and associated annual costs of adverse childhood experiences across Europe and North America: a systematic review and meta-analysis*, The Lancet (September 03, 2019), https://www.thelancet.com/journals/lanpub/article/PIIS2468-2667(19)30145-8/fulltext.

[21] Alice Kuo and Casey Nagel, *Remote school is putting kids under toxic stress*, The Washington Post (August 10, 2020), https://www.washingtonpost.com/outlook/2020/08/10/remote-school-toxic-stress/.

---

the second world war. It does not stop when the virus is under control and there are few people in hospital. You've got to fund the long-term consequences."[22]

52.    Concerns over consistent damage to children's mental health are not limited to the passive effects of distance learning. School districts are actively contributing to stunting student's mental development.

53.    In an interview with the Texas Scorecard again from April of 2021, Dr. Sheri Tomak, PsyD, stated that, "Speaking as both a mom and a psychologist, the continued use of masks … does not appear warranted and is more of a detriment to our children." She went on to note that the mental damage school districts are inflicting on children through masking policies could lead to long term psychological conditions, including depression and anxiety.[23]

54.    Concerns regarding the health and safety of children in digital learning environments extend to isolation that leads to child abuse. James Dwyer, Arthur B. Hanson Chair at the William & Mary School of Law, states:

> We do have evidence of an impact on children's safety and physical well-being. There have been more severe cases of child abuse occurring and many children are suffering from a lack of access to food as a result of not attending school. We also have reason to suspect that there is more widespread maltreatment that has not been showing up at the emergency room.[24]

---

[22] Ian Sample, *Covid poses 'greatest threat to mental health since second world war'*, The Guardian (December 27, 2020), https://www.theguardian.com/society/2020/dec/27/covid-poses-greatest-threat-to-mental-health-since-second-world-war.

[23] Tera Collum, *Psychologist Has 'Significant Concerns' About Long-Term Effects of Masking Students*, Texas Scorecard (April 7, 2021), https://texasscorecard.com/state/psychologist-has-significant-concerns-about-long-term-effects-of-masking-students/.

[24] Jeff Neal, *Will online schooling increase child abuse risks?*, Harvard Law Today (August 14, 2020), https://today.law.harvard.edu/will-online-schooling-increase-child-abuse-risks/.

55.     Harvard Law School Professor Elizabeth Bartholet, faculty director the HLS

Child Advocacy Program echoes these sentiments:

> I agree with Jim on the increased risk of child maltreatment, and I think it's important to think in terms of different categories of parents. One category consists of those who have been reported in the past for child abuse and neglect. These are the classic at-risk families. In the past, their children were being seen by teachers who are mandated to report any suspected abuse to child protection services. Those parents are now under the increased stress that goes with unemployment, isolation, and the related risks of drug and alcohol problems. So, kids that were already in danger are at more risk now and it's showing up in what the doctors are seeing in the emergency room, namely worse forms of injuries and higher death rates.
>
> And now there's a new category of parents with at-risk kids, those with no prior abuse history. A large proportion of all parents now are suffering extreme stresses related to COVID, including new concerns about their jobs, their housing, and their ability to feed their kids. Those stressors put the children at higher risk of maltreatment.[25]

56.     Margo Lindauer, director of the Domestic Violence Institute at Northeastern

University explains the mechanics of how keeping children out of school fosters

the circumstances in which abuse can occur. She writes, "[w]hat the data shows is

that many child abuse and neglect reports come in through school; teachers,

paraprofessionals, and nurses are mandated reporters."[26]

---

[25] Id.
[26] Khalida Sarwari, *Closed Schools Could Be Putting Children At Risk During The Covid-19 Pandemic*, Northeastern University (October 23, 2020) https://news.northeastern.edu/2020/10/13/closed-schools-could-be-putting-children-at-risk-during-the-covid-19-pandemic/.

57.    She goes on to say, "In a non-pandemic world, [if] kids come in with a bruise, or they haven't been fed or bathed, or they have consistent injuries or pain, that potentially could be reported to a child welfare agency."[27]

58.    The Center for Disease Control has noted a "shift" in emergency room visits for child injuries consistent with domestic violence, during the pandemic and highlighted severity of child abuse-related injuries.[28]

59.    Virtual education of school children is not an anodyne policy. By creating physical separation between teachers and students, the principle social mechanism of accountability regarding child welfare, the symbiotic relationship between children, teachers, and parents is disrupted. The potential negative consequences speak for themselves.

60.    In conclusion, mask policies that use banishment from school to deter dissenting parents and students are little more than a "join or die" policy designed to force parents to accept unhealthful mask wearing or an inferior separate-but-equal style of educational isolation.

---

[27] *Id.*

[28] Elizabeth Swedo, Nimi Idaikkadar, Ruth Leemis, Taylor Dias, Lakshmi Radhakrishnan, Zachary Stein, May Chen, Nickolas Agathis, Kristin Holland, *Trends in U.S. Emergency Department Visits Related to Suspected or Confirmed Child Abuse and Neglect Among Children and Adolescents Aged <18 Years Before and During the COVID-19 Pandemic – United States, January 2019-September 2020*, Centers for Disease Control and Prevention (December 11, 2020) https://www.cdc.gov/mmwr/volumes/69/wr/pdfs/mm6949a1-H.pdf.

# IV.   ARGUMENTS AND AUTHORITIES

## A.    The Mootness Doctrine

61.    Under Article III of the U.S. Constitution, the jurisdiction of federal courts is limited to actual, ongoing cases and controversies. U.S. Const. art. III, § 2, cl. 1.

62.    Article III mootness is derived from the constitutional requirement that judicial power be exercised only in "cases" or "controversies." *Liner v. Jafco*, 375 U.S. 301, 306 n. 3 (1964).

63.    Usually, a case or controversy must exist throughout judicial proceedings, and not just when the lawsuit is filed or when review is granted by an appellate court. *Lewis v. Continental Bank Corp*., 494 U.S. 472, 477 (1990).

64.    The dispute must concern "live" issues and generally, the plaintiffs must have a personal interest in the outcome of the case. *Id.*

65.    The Supreme Court has described mootness as follows:

> The "personal stake" aspect of mootness doctrine ... serves primarily the purpose of assuring that federal courts are presented with disputes they are capable of resolving. One commentator has defined mootness as "the doctrine of standing set in a time frame: The requisite personal interest that must exist at the commencement of the litigation (standing) must continue throughout its existence (mootness)."

*United States Parole Comm'n v. Geraghty*, 445 U.S. 388, 397 (1980), quoting Henry P. Monaghan, Constitutional Adjudication: The Who and When, 82 Yale L. J. 1363, 1384 (1973).

**B.    Exceptions to the Mootness Doctrine**

i.    The "Capable of Repetition, Yet Evading Review" Exception.

66.    Some disputes or injuries may arise in the short-term and have the potential

for recurrence, but always fail to last long enough to permit federal judicial review.

In such a situation, federal courts have justified an exception to the mootness

doctrine where there are "exceptional situations," where the plaintiff "can make a

reasonable showing that he will again be subjected to the alleged illegality." *City of*

*Los Angeles v. Lyons,* 461 U.S. 95, 109 (1983) (citation omitted).

67.    The Supreme Court of the United States has instructed lower courts on the

application of this doctrine, holding:

> [I]n the absence of a class action, the "capable of repetition, yet
> evading review" doctrine was limited to the situation where two
> elements combined: (1) the challenged action was in its duration too
> short to be fully litigated prior to its cessation or expiration, and (2)
> there was a reasonable expectation that the same complaining party
> would be subjected to the same action again.

*Weinstein v. Bradford*, 423 U.S. 147, 149, 96 S. Ct. 347, 349 (1975).

ii.    The "Voluntary Cessation" Exception.

68.    If a defendant voluntarily terminates the allegedly unlawful conduct after the

lawsuit has been filed but retains the power to resume the practice at any time, a

federal court may deem the case nonmoot. *Friends of the Earth, Inc. v. Laidlaw*

*Envtl. Servs. (TOC), Inc*., 528 U.S. 167, 189 (2000).

69.    The "heavy burden" of persuading the court that a case has been mooted by the defendant's voluntary actions lies with the party asserting mootness, and the standard for such a determination is a "stringent" one: "if subsequent events ma[ke] it absolutely clear that the allegedly wrongful behavior [can] not reasonably be expected to recur." *Id., citing United States v. Concentrate Phosphate Export Assn., Inc.*, 393 U.S. 199, 203 (1968).

70.    This exception is supported by the Supreme Court because, in addition to ensuring that the defendant is not "free to return to his old ways," there is "a public interest in having the legality of the practices settled." *United States v. W. T. Grant Co.*, 345 U.S. 629, 632 (1953) (citation omitted).

**C.    The JGISD Mask Policy is capable of repetition while evading review.**

71.    The close of the term and Governor's Executive Order regarding TEA guidance have made the period during which litigation may be pursued extraordinarily short, given Plaintiff's efforts to resolve matters without recourse to judicial action.

72.    Unfortunately, there is a reasonable expectation that the same complaining party will be subjected to the same action again for several reasons.

73.    First, the efforts that JGISD may adopt in the future to arrest the spread of COVID-19 are uncertain due to the fact that multiple strains of the virus have emerged or are capable of emerging. While many experts have questioned the

efficacy of masks on students in public schools, office holders and those advising them have been particularly critical of any suggestion that mask use is a critical tool in fighting COVID-19 in part because variants may spring up at any time and warrant the resumption of child-masking requirements.[29]

74.    Second, due to the secrecy employed in the adoption of the JGISD Mask Policy, its basis remains unknown. JGISD asserts that its behavior as described here has been perfectly acceptable, and refuses to admit to any error that would prevent it from using this approach at JGISD's discretion.

75.    But this Court can take judicial notice that flu outbreaks occur routinely. COVID lockdowns have been relaxed and then repeated. Thus, not only *may* these TOMA violations occur again, but such behavior is *likely.* Surely no reasonable person would assert that our medical industry have mastered the common cold, flu, and all COVID variations.

76.    Defendants cannot deny that common parents were kept in the dark about the decision-making process of the Mask Policy. Nor will Defendants deny that parents were never given the opportunity to present their thoughts on the matter or suggest that the policy was wrong.

---

[29] Bollinger, Robbert and Stuart Ray, New Variants of Coronavirus: What You Should Know, Johns Hopkins Medicine, February 22, 2021
https://www.hopkinsmedicine.org/health/conditions-and-diseases/coronavirus/a-new-strain-of-coronavirus-what-you-should-know

77.     Plaintiff suspects that Defendant will take the position that secret meetings are perfectly acceptable and the Texas Open Meetings Act can be ignored whenever the JGISD management can claim that a policy must be developed by law. This is the archetype of behavior that the Texas Open Meetings Act was designed to make illegal and actionable by any interested party.

78.     Third, assuming the Mask Policy was based on the TEA guidelines, said guidelines are subject to revision and reinstatement of masking protocols in the event that the Governor's Executive Order in response to new COVID-19 strains.

79.     Although the Governor's executive order directed TEA to rescind its policy requiring mask wearing, there no reason why JGISD cannot again adopt a compulsory Mask Policy by means of its secret committee for the next reason of its own choosing – there is a flu season every year and the chief medical advisor to the president Dr. Fauci has stated[30] that this nation may need to make face masks a permanent fixture in American life:

> "So it is conceivable that as we go on, a year or two or more from now, that during certain seasonal periods when you have respiratory-borne viruses like the flu, people might actually elect to wear masks to diminish the likelihood that you'll spread these respiratory-borne diseases," Fauci said.

---

[30] Haring, Bruce, Masks May Become Seasonal Wear, Dr. Anthony Fauci Says on 'Meet The Press', May 9, 2021, https://deadline.com/2021/05/masks-seasonal-dr-anthony-fauci-meet-the-press-1234752545/

**D.      JGISD's voluntarily amendment of the Mask Policy is no solution.**

80.      JGISD made its Mask Policy voluntary rather than compulsory nine days after Plaintiff filed suit.

81.      Although the Governor's executive order directed TEA to rescind its policy requiring mask wearing, there no reason why JGISD cannot again adopt a compulsory Mask Policy by means of its secret committee for the next reason of its own choosing.

82.      Indeed, JGISD has made no documented effort to clarify the nature of, nor provide minutes for, the meeting of its secret committee that adopted the compulsory Mask Policy.

83.      Both reinstitution of the Mask Policy and further legislation by Star Chamber are within the discretionary power of the school district.

84.      The case law cited above makes clear that the burden lies squarely on Defendants to show that voluntary cessation by JGISD is of a nature such that it should not count as an exception to mootness. Defendants have, so far, made no pleading to that effect.

85.      Even if the Mask Policy remains rescinded for the foreseeable future, the Violation of the Texas Open Meeting Act, denial of C.L.'s constitutional right to a free and equitable public education, and the violation of Plaintiff's right to

determine medical decisions for his minor son, remain questions that are both unresolved and capable of repetition.

86.     The public has an interest in having these questions settled, given that state power is at its zenith during exceptional circumstances like pandemics. Courts properly defer to the executive branch when extreme circumstances warrant emergency action. However, now that the storm has been weathered, courts should not hesitate to scrutinize executive actions like those taken by JGISD for conformity to law and redress rights violations where appropriate.

87.     Judicial scrutiny is especially necessary where there is evidence that drastic action can be taken again.

88.     In sum, the JGISD's power to issue mask mandates, above and beyond TEA guidelines, remains intact and legislation by covert committee remains an option open to Defendants.

89.     Consequently, the voluntary cessation exception to the mootness doctrine applies, and alternatively, Defendants have not demonstrated that the exception does not apply.

## V.     CAUSES OF ACTION

### A. Claim – JGISD's mask policy violates the Texas Open Meetings Act.

90.     Secret meetings of government entities violate the Texas Open Meetings Act, sec. 551.002 of the Texas Gov't Code, which requires that "[e]very regular, special, or called meeting of a governmental body shall be open to the public…".

91.     Furthermore, sec. 551.021(a) requires that "[a] governmental body shall prepare and keep minutes, or make a recording, of each open meeting of the body."

92.     The Texas Supreme Court has held that, "[t]he Open Meetings Act generally provides that an action taken in violation of the Act is 'voidable'…", *Town of Shady Shores v. Swanson*, No. 18-0413, 63 Tex. Sup. Ct. J. 180, 2019 Tex. LEXIS 1213, at *19 (Dec. 13, 2019).

93.     In the Spring of 2020, JGISD created a School Reopening Committee, comprised of unknown members. The committee members' identities have been kept secret, until mid-March, and the minutes and policies of the committee are nowhere published. All that can be shown are the TEA guidelines themselves, Defendants have not and will not show any records of their compliance to TEA in creating their Mask Policy.

94.     After a search on the JGISD website, no record could be found of any minutes, at any meeting, that describe the adoption of the mask policy, or any authorization of any committee assigned to develop this policy.

95.    Due to the absence of public record, regarding how and why the school mask mandate was adopted, Defendants have failed to demonstrate that it is predicated on a rigorous scientific and medical basis. Even the Governor's expired mask mandates exempted children. Furthermore, the absence of public records regarding the Plan drafting committee's meetings, prevents public scrutiny of any evidence weighing against adoption of a mandate e.g., negative developmental impacts on children stemming from an inability to see teachers' faces.

96.    The lack of any transparency in the development of the mask policy is a denial of the right to petition and flies in the face of every good government practice adopted since the American Revolution. That is a violation of the Act.

97.    Further, Plaintiffs suspect Defendants will attempt to hide behind TEA's guidelines and the governor's executive orders and cry that they had no discretion in implementation of the policies. However, GA-29 had an exemption for children under 10 for mandatory masking and JGISD did not include such exemption in their Mask Policy. Further, photos in Exh. 7 show the unequal enforcement of such measures. This is evidence that JGISD had discretion in implementing their Mask Policy as they could pick and choose what rules of TEA and the governor's orders they wished to implement and enforce.

98.    Defendants may claim to rationally follow TEA's guidance and cite the TEA Guidebook for Public Health Operations [ECF Doc 10-1, Appx.00009], however

the evidence of inconsistencies shows otherwise. The photos in Exh. 7 clearly show that JGISD did not base their Mask Policy "based in scientific understanding of how the virus spreads;" and since parents were closed out of the process, JGISD certainly did not "engage parents" or "[communicate] transparently and matter-of-factly with relevant parties." [ECF Doc 10-1, Appx.000012 & Appx.000024]. TEA explicitly states, "Schools must comply with the governor's executive order regarding the wearing of masks." [ECF Doc 10-1, Appx.000003]. Yet, JGISD did not include the children under 10 exemptions from GA-29 in their Mask Policy. [ECF Doc 10-1, Appx.000006]. Nor did JGISD follow consistent masking and social distancing policies as required by TEA and the Governor's Executive orders. *See* Exh. 7. JGISD had discretion and is liable for the closed creation and irrational implementation of their Mask Policy in violation of TOMA.

99.     Plaintiffs would not encourage every parent to file suit against every school with a mask policy – their umbrage is directed toward a public school which has illegally created an irrational Mask Policy enforced unequally, openly failing to practice what it demands of children. This situation is an exceptional one, JGISD has shown to inconsistently follow the marching orders that JGISD claims to follow. Such irrational implementation is exceptional and would shock the consciousness of any reasonable person. JGISD is perfectly capable of repeatedly circumventing TOMA in future committees if left without accountability.

100.   JGISD can provide no evidence to justify the irrational and inconsistent application of the Mask Policy on C.L. and others shown in Exh. 7. JGISD cannot hide behind TEA, the governor, and words like "plan" when JGISD did not follow TEA recommendations of following the governor's orders on masking while using their closed committee meetings in violation of TOMA. JGISD cannot plead any defense in the law that will be consistent their actions in regard to TEA guidance and GA-29's requirement that children under 10 are exempt from masking. JGISD cannot justify the removal of C.L. for being unmasked and the unmasked crowds of individuals shown in Exh. 7.

**B. Claim—JGISD's mask mandate violates the Fourteenth Amendment pursuant to 42 U.S.C. § 1983.**

i. Legal Background

101.   The Fourteenth Amendment to the United States Constitution forbids the State to deprive any person of life, liberty, or property without due process of law. *Goss v. Lopez*, 419 U.S. 565, 572 (1975). The proper vehicle to assert Fourteenth Amendment violations is Section 1983. *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978). A local government entity may be sued under § 1983 when it executes a policy or custom, made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, and inflicts the injury that the government as an entity is responsible. *Id.*

102.   C.L.'s rights to equal protection and due process were violated when he was unlawfully discriminated against by being constructively expelled from the school without any sort of hearing, all stemming from an irrational and illegally adopted policy devoid of any scientific evidence.

103.   Children do not shed their constitutional rights when they enter a school. *Tinker v. Des Moines School Dist.*, 393 U.S. 503, 506 (1969). "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures –Boards of Education not excepted." *West Virginia Board of Education v. Barnette*, 319 U.S. 624, 637 (1943).

104.   While the Constitution cannot control prejudices in the community and "private biases may be outside the reach of the law," "the law cannot, directly or indirectly, give them effect." *Bailey v. Mansfield Indep. Sch. Dist.*, 425 F. Supp. 3d 696, 717-719 (N.D. Tex. 2019), appeal dismissed sub nom. *Bailey v. Vaszauskas,* No. 19-11313, 2020 WL 3053942 (5th Cir. Feb. 28, 2020). Public officials cannot avoid their constitutional duty by "bowing to the hypothetical effects of private ... prejudice that they assume to be both widely and deeply held." *Id.*

105.   Recognizing that absent membership in a suspect or protected class, a plaintiff can succeed on a "class of one" equal protection claim only when there is "no rational basis for the difference in treatment" *Id.* at 717.

106. Under rational basis review, "legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.*

107. "[T]he Equal Protection Clause requires only a rational means to serve a legitimate end." *Id.* "Despite its deference, however, the rational basis test is not a toothless one." *Greater Hous. Small Taxicab Co. Owners Ass'n v. City of Hous., Tex.*, 660 F.3d 235, 239 (5th Cir. 2011) (citation omitted). "[E]ven the standard of rationality as we so often have defined it must find some footing in the realities of the subject addressed by the legislation." *Heller v. Doe*, 509 U.S. 312, 321, 113 S.Ct. 2637, 125 L.Ed.2d 257 (1993). A "State may not rely on a classification whose relationship to an asserted goal is so attenuated as to render the distinction arbitrary or irrational. Furthermore, some objectives—such as a bare desire to harm a politically unpopular group—are not legitimate state interests." *City of Cleburne*, 473 U.S. at 446-47, 105 S.Ct. 3249 (cleaned up).

108. The public's "mere negative attitudes, or fear" of a minority group "are not permissible bases" for differential treatment, since the law cannot act on private biases. *Id*. at 448, 105 S.Ct. 3249.

109.   Claims under the Equal Protection Clause can include both tangible and intangible injuries. *Bailey*, 425 F. Supp. 3d at 716–17.

> "Discrimination itself, by perpetuating archaic and stereotypic notions or by stigmatizing members of the disfavored group as innately inferior and therefore as less worthy participants in the political community, can cause serious noneconomic injuries to those persons who are personally denied equal treatment solely because of their membership in a disfavored group.

*Id.*

110.   The Court noted in *Romer v. Evans* that under the ordinary deferential equal protection standard—that is, rational basis—it would "insist on knowing the relation between the classification adopted and the object to be obtained." 517 U.S. 620, 640 (1996). It is this search for a "link" between classification and objective, noted the Court that "gives substance to the Equal Protection Clause." *Id.* If a community's perception was based on nothing more than unsupported assumptions, outdated stereotypes, and animosity, it was necessarily irrational and provided no legitimate support for the entities decision. *Bailey*, 425 F. Supp. 3d at 716–17. Such types of amendments are "a status-based enactment divorced from any factual context from which we could discern a relationship to legitimate state interests." *Id.*

111.   A short suspension is, of course, a far milder deprivation than expulsion. *Goss v. Lopez*, 419 U.S. 565, 576 (1975). But, 'education is perhaps the most important function of state and local governments,' *Brown v. Board of Education,*

347 U.S. 483, 493 (1954), and the total exclusion from the educational process for more than a trivial period, and certainly if the suspension is for 10 days, is a serious event in the life of the suspended child. *Id.* Neither the property interest in educational benefits temporarily denied nor the liberty interest in reputation, which is also implicated, is so insubstantial that suspensions may constitutionally be imposed by any procedure the school chooses, no matter how arbitrary. *Id.*

112.   The fundamental requisite of due process of law is the opportunity to be heard,' *Grannis v. Ordean*, 234 U.S. 385, 394 (1914), a right that 'has little reality or worth unless one is informed that the matter is pending and can choose for himself whether to . . . contest.' *Goss*, 419 U.S. at 579.

113.   At the very minimum, therefore, students facing suspension and the consequent interference with a protected property interest must be given some kind of notice and afforded some kind of hearing. *Id.* 'Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified.' *Id.*

114.   The student's interest is to avoid unfair or mistaken exclusion from the educational process, with all of its unfortunate consequences. *Id.* The Due Process Clause will not shield him from suspensions properly imposed, but it disserves both his interest and the interest of the State if his suspension is in fact unwarranted. *Id.* The concern would be mostly academic if the disciplinary process

were a totally accurate, unerring process, never mistaken and never unfair. *Id.* at 580. Unfortunately, that is not the case, and no one suggests that it is. *Id.*

115.   Disciplinarians, although proceeding in utmost good faith, frequently act on the reports and advice of others; and the controlling facts and the nature of the conduct under challenge are often disputed. *Id.* The risk of error is not at all trivial, and it should be guarded against if that may be done without prohibitive cost or interference with the educational process. *Id.* It would be a strange disciplinary system in an educational institution if no communication was sought by the disciplinarian with the student in an effort to inform him of his dereliction and to let him tell his side of the story to make sure that an injustice is not done. *Id.*

116.   The Court does not believe that school authorities must be totally free from notice and hearing requirements if their schools are to operate with acceptable efficiency. *Id.*

117.   Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. *Id.* The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school. *Id.*

118.   To state a claim under section 1983 against a school district, the "complaint must allege sufficient factual content to permit the reasonable inference (1) that a constitutional violation occurred and (2) that an 'official policy' attributable to the school district's policymakers (3) 'was the moving force' behind it." *Bailey*, 425 F. Supp. 3d at 713.

ii. The District violated C.L.'s rights on the pretext of an illegally adopted rule.

119.   In this case, similarly situated students, namely, students in school, are treated differently, due to uneven application and enforcement of the mask policy. Exh. 7. For example, students are not required to be masked during school plays, school photos, in close contact among players in school-sponsored football, or in the stands at indoor school-sponsored sporting events. Exh. 7.

120.   Taken together, the photos attached in Exhibit 7 demonstrate that there is no consistent medically based enforcement of the Mask Policy. Instead, the photos show that a pattern of whimsical and haphazard enforcement of the mask mandate is applied to students, provided they wear it at the door.

121.   Because the mask policy is not based on supported science and is enforced unevenly, no reasonable person can defend JGISD's policy as anything other than an arbitrary deprivation rights to disfavored student families to public education. C.L. was unlawfully discriminated under the Equal Protection clause because of the enforcement of the illegal 'official policy' by JGISD to treat him, an unmasked

individual, differently than those other students, without any scientific support and with inconsistent implementation. *See Bailey*, 425 F. Supp. 3d at 716–17.

122.   TOMA states that all actions taken in violation of TOMA are voidable. No one can claim that a policy adopted infringing fundamental rights protected by the Constitution during illegal meetings held in secret further government interests under the Constitution. Especially when the point of the state law, TOMA, is to prevent situations such as this. After JGISD adopted the Mask Policy illegally, C.L. was barred from school without licit authority, due to the absence of any properly adopted policy on which he could justifiably rely to bar a nonconforming student from school. If a student is to be removed from school, at the bare minimum there ought to be a written legal policy that gives authority for such policy, rather than the whims of those who do the removal. C.L.'s constitutional rights to procedural due process were violated.

123.   C.L. was deprived of procedural due process as he was not allowed to be heard before such expulsion occurred. *See Bailey v. Mansfield Indep. Sch. Dist*., 425 F. Supp. 3d at 720. Rather than going through normal disciplinary procedures, the school, without legally adopted authority, removed C.L. from the premises and constructively barred him from returning unless he complied, violating C.L.'s right to procedural due process under the Fourteenth Amendment. C.L. should have had

some fair opportunity to respond before being constructively expelled. *See Goss*, 419 U.S. at 579-80.

124.   The question, therefore, is whether bias concerning C.L.'s unmasked entry furnishes a rational basis for JGISD's decision constructively expel him and, ultimately, not allow him to return as a student unless he complies, causing C.L. harm and stigma. The inconsistent and irrational "negative reaction" of some members of the community may have to an unmasked individual is not a proper basis for discriminating against him. *See City of Cleburne,* 473 U.S. at 446-47, 105 S.Ct. 3249. The photos attached in Exhibit 7 demonstrate that there is no consistent medically based enforcement of the Mask Policy and C.L. was unlawfully and irrationally discriminated against. C.L.'s Fourteenth Amendment rights to equal protection and due process were violated.

## VI.   <u>APPLICATION FOR PRELIMINARY INJUNCTION</u>

125.   In his Original Complaint, Plaintiff requested a temporarily restraining order. Recognizing the futility of seeking such a remedy after the school year is over, Plaintiff has abandoned its application for temporary restraining order, and now seeks a preliminary injunction order ("PI") Pursuant to Fed. R. Civ. P. 65(a) to protect the status quo and stop violations of the Texas Open Meetings Act, by preventing Defendants from enforcing their prohibition against non-mask wearing

students entering school, and receiving in-person instruction, until the Court issues a temporary injunction, or until the case can be adjudicated.

126.   The prerequisites to obtaining a preliminary injunction that the applicant must show are: (1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable harm if the injunction is not granted, (3) that the threatened injury outweighs any harm that the injunction might cause to the defendant, and (4) that the injunction will not disserve the public interest. *Opulent Life Church v. City of Holly Springs, Miss.*, 697 F.3d 279, 288 (5th Cir. 2012).

127.   The loss of constitutional freedoms for, "even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns,* 427 U.S. 347, 373 (1976). Additionally, the loss of quality educational time can never be replaced.

128.   The harm to the Plaintiff, if this preliminary injunction is denied, will be significant and irreparable. If this Court allows the ISD to continue unchecked, C.L. faces violations of his Fourteenth Amendment rights to due process and equal protection and the total loss of his right to a public education – of similar quality to his masked or unmasked wearing peers – for no other reason than a secret policy, created by a secret and illegal committee, that was inconsistently enforced and implemented.

129.   The Plaintiffs are entitled to a preliminary injunction because Defendants can show no harm to the ISD, in granting the relief requested. Defendants violated

the legal process and the Texas Open Meetings Act. Enjoining an already illegal and unconstitutional policy does not cause harm to the Defendants.

130.   Because it is clear Defendants violated TOMA and Plaintiff's rights to due process and equal protection under the Fourteenth Amendment, and there is no harm is forcing Defendant's to obey TOMA, there is a substantial likelihood that the plaintiffs will prevail on the merits. Therefore, Plaintiff respectfully requests that this Court issue a preliminary injunction against the Defendants – enjoin them, their agents, representatives, employees, or anyone acting on their behalf, including teachers –until further order of the Court; and from taking any actions to enforce the mask policy outlined in the Plan, refrain from secret closed committees, or any iteration thereof against C.L., including but not limited to, permitting C.L. access to school without a mask.

## VII.   APPLICATION FOR TEMPORARY & PERMANENT INJUNCTION

131.   Similarly, Plaintiffs seek that this Court first temporarily enjoin, and then permanently enjoin the ISD, restraining it or anyone acting on its behalf, including teachers, from enforcing the mask policy outlined in the Plan; or any later iteration thereof against Plaintiff, including but not limited to, permitting C.L. access to school without a mask.

132.   Absent judicial intervention, Plaintiff faces ongoing requirements impacting his education, and has no practical ability to, again, prevent the ISD from further penalizing him, and continuing to provide an inequitable education.

133.   There is no adequate remedy at law that will give C.L. full relief, because denial of in-person education should be addressed immediately. Each day, the Plaintiff suffers significant irreparable damage to his constitutional rights, to due process of law and education. C.L.'s total damages cannot be measured with certainty, and it is neither equitable, nor conscionable, to allow Defendants to violate C.L.'s constitutional rights.

134.   The Court should note it is not necessary at the hearing for temporary injunction, for Plaintiffs to prove they will ultimately prevail, *Sun Oil Co. v. Whitaker*, 424 S.W.2d 216, 218 (Tex. 1968) but only that Plaintiffs are entitled to the preservation of the status quo, pending trial. *Iranian Muslim Org. v. City of San Antonio*, 615 S.W.2d 202, 208 (Tex. 1981).

135.   The comparative injury, or balance of equities and hardships, to the parties and to the public interest, support granting injunctive relief; the Plaintiff is only asking the Court to preserve the status quo and require Defendants to cease unlawfully violating TOMA resulting in infringing upon Plaintiff's constitutional rights – with a temporary, and then permanent injunction after trial.

## VIII.  JURY DEMAND

136.   Plaintiffs herewith tender the jury fee and request a jury trial.

## IX.   FINAL SUMMARY

137.   In sum, Plaintiff's do not challenge the medical efficacy of a proper medical mask used in a medical environment, the propriety of masking adults, the propriety of masking teachers, nor even, the propriety of voluntary masking of children with parental consent. Plaintiff's argument rests on the unimpeachable reality that mandatory masking of school-aged children is medically unnecessary, psychologically, and educationally harmful, and unjustified based on contemporary understanding of COVID-19 transmission among children. Specifically, Plaintiffs contend that Defendants' mandatory child masking policies violate the Texas Open Meetings Act in their inception, and violate the Texas Constitution and Federal Constitution's guarantees enshrining the civil right to free public education of the Fourteenth Amendment's Equal Protection and Due Process clauses by creating a bifurcated system of education where non-masking students are relegated to a separate and unequal class of students who are sentenced to virtual learning in leu of in-person instruction. Plaintiffs further contend that less restrictive means of accomplishing the government's interest in arresting the spread of COVID-19 can be accomplished through employing social distancing, face shields, and vaccinations in schools and other prophylactic measures.

# X.    PRAYER

Plaintiffs respectfully pray that the Defendants be cited to appear and answer, as required by law; and, after trial by jury, Plaintiffs be awarded judgment against Defendants, a Temporary Injunction, a Permanent Injunction, actual damages, and general damages; mental anguish; nominal damages in the alternative; reasonable and necessary attorney's fees, as damages in equity; pre-judgment and post-judgment interest; court costs, and exemplary damages; and all other relief to which Plaintiffs may be justly entitled, in both law and equity.

Respectfully submitted,

By: /s/ Warren V. Norred
Warren V. Norred,
Texas Bar No. 24045094
wnorred@norredlaw.com
515 E. Border; Arlington, Texas 76010
P: 817-704-3984; F: 817-524-6686
Attorney for Plaintiffs

**Exhibits:**
Exh 1. June 18, 2020, Jayton-Girard ISD Schoolboard Minutes
Exh. 2. Declaration of Clint Long
Exh. 2a JGISD 2020-2021 Reopening Plan
Exh. 2b Video of Denial of Entry
Exh. 3. GA-34
Exh. 4. GA-29
Exh. 5. April 20, 2021, Jayton-Girard ISD Schoolboard Minutes
Exh. 6. March 10, 2021, Jayton-Girard ISD Schoolboard Minutes
Exh. 7. School Photos

CERTIFICATE OF SERVICE – I certify that on June 18, 2021, I filed this amended complaint through the Court's efiling system to all counsel of record.

/s/ Warren V. Norred
Warren V. Norred

# EXHIBIT 1

Jayton-Girard Independent School District - June 18, 2020 – School Board
Meeting Minutes

**EXHIBIT 1**

The board of Trustees of the Jayton-Girard Independent School District met in regular session on June 18, 2020, with the following members present: to wit:

Amanda McGee-President

Kathy Owen                                         Connie Martinez
B.J. Baldridge                                      L'Rae Lee


**School Officials Present**: Trig Overbo-Superintendent, Lyle Lackey-Principal, Laci Scogin-Business Manager

**Visitors Present and their comments:**

And the following members absent: Cole Carpenter and Cody Stanaland

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order by President Amanda McGee at 7:02 pm.

Principal's report included scheduling, curriculum, summer training, Chromebook vs iPads, summer workouts, and Scholastic Network.

Superintendent's report included library relocation and surplus books, school housing repairs, school calendar, begin COVID-19 protocol talks, front entrance, day care/gym, paving, tennis courts, and school housing.

Minutes from the May 14, 2020 Regular Meeting and the June 1, 2020 Called Meeting were presented. Motion made by Kathy Owen, seconded by Connie Martinez to approve the minutes.  All in favor.

The bills and financial report were presented.  Motion made by L'Rae Lee, seconded by B.J. Baldridge to approve the bills as presented.  All in favor.

Motion made by B.J. Baldridge, seconded by Connie Martinez to call for vehicle fuel and propane bids and to call for vendors for Personal Property valued between $10,000 and $25,000 for the 2020-2021 fiscal year.  All in favor.

Motion made by Connie Martinez, seconded by B.J. Baldridge to approve the annual review of Investment Policies and Procedures as presented.  All in favor.

Motion made by Kathy Owen, seconded by Connie Martinez to name Laci Scogin as the Investment Officer for Jayton-Girard ISD. All in favor.

Motion made by B.J. Baldridge, seconded by Kathy Owen to approve the request for County Permanent School Funds in the amount of $348,063.22 for capital improvements.  All in favor.

No action taken on Depository Contract Extension with Bank of Texas.  Current contract in effect until August 31, 2021.

Motion made by L'Rae Lee, seconded by B.J. Baldridge to approve missed school day waiver as presented.  All in favor.

Motion made by Kathy Owen, seconded by B.J. Baldridge to accept bid from White River Youth Camp in the amount of $2,200 for the house located at 601 Jefferson pending proof of bond and insurance.  All in favor.

**EXHIBIT 1**

No action taken on Fund Balance Designation.

Next board meeting: July 21, 2020 at 7:00pm

Motion made by Connie Martinez, seconded by B.J. Baldridge to adjourn the meeting.  All in favor.

Meeting adjourned at 8:08 pm.

_____          _____
President                                                                Secretary

# EXHIBIT 2

Declaration of Clint Long with Attached Exhibits

## Declaration (TEX. CIV. PRAC. & REM. CODE § 132.001)

"My name is Clint Long, my date of birth is August 03rd, 1978 and my contact address is Box 243 Jayton, Tx. 79528. I declare under penalty of perjury that the following statements are true and correct."

1. I am a resident of Kent County Texas.

2. My son Carson Long attends school in the Jayton-Girard Independent School District.

3. On July 17th, the school district sent a text message to all parents, with children enrolled in Jayton-Girard ISD.

4. The text message included an attachment labeled, "JGISD 2020-2021 Reopening Plan. ("Plan" attached as Exhibit 2A).

5. Neither the process by which the Plan was created, nor the parties responsible for the creation of the plan were specified anywhere in the document.

6. I could not find the Plan anywhere on the Jayton-Girard ISD website, and I believe it is not published anywhere.

7. No forms were sent to parents to sign regarding the Plan.

8. Jayton-Girard ISD reopened school on August 13, 2020.

9. The Plan included detailed provisions regarding face coverings:

- Faculty, staff, and students are required to wear a face covering when entering and exiting the building, and during passing periods.

  - PK-2nd grade will be required to wear a face covering when entering or exiting the building. Once in the classroom a face shield provided by the district will be worn during instruction time. Neck gaiters provided by the district will be worn during recess and PE time when students are in close contact.

  - 3rd-12th grade will be allowed to wear their own choice of face covering when entering or exiting the building, in the classroom, and during the passing periods. Neck gaiters provided by the district will be worn during recess, PE time, and athletics when students are in close contact. Students may be asked by their teachers at times to wear a face shield instead of a mask for educational purposes.

Declaration of Clint Long                                                                Page 1

EXHIBIT 2

10. The Plan also includes a number of exemptions to the general mask mandate, including:

- We don't intend for the students to wear a face covering for the entire duration of a school day and faculty and staff will be looking for every opportunity to reduce the use of face coverings when other mitigating strategies can be met.

  For example:

  - Face coverings are **NOT** required to be worn in the classroom when 6ft of social distancing is available. (teacher discretion)

  - Face coverings are **NOT** required when students are outside and are able to maintain 6ft of social distancing. (teacher & coach discretion)

  - Face coverings are **NOT** required when eating breakfast & lunch.

11.  The Plan includes no exemptions based on disability, religion, or conscience.

12. The Plan does specify that the mask policies are subject to revision based on CDC, state, and local recommendations:

*Our first priority is the safety of our students, employees, families, and surrounding community, and we strive to make the most responsible decisions to facilitate a safe environment for all. We would also like to emphasize that because of the fluid nature of this pandemic, CDC, state and local authority recommendations and mandates may be different on the first day of school than they are at the time of distribution of this information. We will adjust accordingly.*

13. I requested a religious exemption from mask wearing from the school because I believe the basis for wearing masks is not true. My request was denied.

14. In March of 2021, the names of the committee members who authored the Plan were released to some parents, but were not published on Jayton-Girard ISD website.

15. However, the process by which the committee drafted the Plan remains unknown. Membership criteria regarding on the committee remains secret.

16. Carson has been denied access to Jayton-Girard ISD, during the Spring 2021 term due to my objection to mask wearing on religious and conscience grounds.

17. The ISD, through its agents, has cited the mask policy as the grounds for Carson's exclusion from school.

18. On March 11th, 2021, I approached to door to the school with my son but was stopped outside by a school official Lyle Lackey ("Recording" attached as Exhibit 2B).

19. We exchanged greetings, but I observed him blocking the door, so I asked "we're not coming in?"

20. I was then told that Carson had to wear a mask to enter.

21. When I asked him if he was going to deny us access without a mask, he said, "Yes."

22. When I asked about the religious exemption that we were claiming, he replied that administrative codes that referred to immunization exemptions based on religion did not apply to masks.

23. When I asked, "Either way, you're not going to accept religious exemptions?" he replied, that exemptions only apply to immunization.

24. Ultimately, my son was barred from entering school because he refused to comply with a mask policy based on a secretly created irrational school policy that has no basis and to which he had a sincerely held religious belief.

Executed in Kent County, Texas on April 16,, 2021

Clint Long

Declaration of Clint Long                                                                 Page 3

# EXHIBIT 2A

JGISD Reopening Plan

# JGISD 2020-2021 REOPENING PLAN



**Our objective is to return to the social interaction of a connected learning environment while implementing reasonable measures for student and staff safety.**

*At JGISD, we are committed to a safe and complete return to school on August 13, 2020, and we are preparing to provide full in-person instruction. If you are not comfortable sending your child into the school building, then remote learning for PK-12th grades will be provided in compliance with TEA guidelines. We have been monitoring the spread of Covid-19 in Kent County and have created a plan that is reasonable and appropriate to do our part to stay healthy and provide a safe learning environment for all of our staff and students. The plans set forth are subject to change depending on future developments, but the following will allow us to return to the school environment we so deeply love and value.*

Case 5:21-cv-00111-H   Document 16   Filed 06/18/21   Page 50 of 117   PageID 409

# *Content Covered*

*01-- Daily Procedures*

*02-- Face Coverings*

*03-- Remote Learning Plan*

*04-- Cleaning Protocols*

*05--Distancing Guidelines & Supporting a Healthy Campus*

*06--Partial Closures & Plan Review*



# *01--Daily Procedures*

*In order for JGISD to return to social interactions of a connected learning environment, we will be implementing reasonable measures to help stop the spread of Covid-19. These procedures include screening for symptoms, reducing points of congestion in the building, enforcing regular hygiene, and implementing other prevention and mitigation tactics:*

- **District Transportation:**

  - Will be provided for students that live outside the city limits.

  - Upon entering the vehicle the student will have his/her face covered, have his/her temperature taken, sanitize hands, and sit as socially-distanced as space allows inside the vehicle.

  - Parents must wait for the student to be cleared by the driver and seated inside the vehicle before they may leave the drop-off site.

  - Once arrived at school, students will enter the building by the playground door and go to their designated area or classroom for breakfast.

- **Student drop off times in the mornings by parents:**

  - Students are to arrive on campus between 7:35am and 8:00am.

  - PK & K can enter the backdoor of their teachers' classrooms by the playground.

  - 1st-6th graders can enter the elementary door in front of the building or the door by the cafeteria.

  - 7th-12th graders can enter the building through the band hall doors.

  - Covid-19 screening procedures of all students will be done by staff members as they enter the building (temperature check, hand sanitation, and checking for a face covering),

  - Parents must wait for the student to be cleared and inside the building before they may leave the drop-off site.

  - Students will go directly to their designated classroom or area and will be given the opportunity to eat breakfast until 8:00am.

- **Lunch Time:**

  - To allow for social interaction, students will eat together but maintain a degree of social distancing.



- o Lunch tables will be spread out in the cafeteria and gym foyer to provide room for social distancing and lunch times will be staggered to provide for more time to serve meals and for proper cleaning of tables.

- *PE, Recess, and Break Times*:

  - o Students will enjoy daily PE, recess, and break times that have been staggered to allow for appropriate socialization opportunities while reducing congestion.

- *Pick up Times:*

  - o Bus students will exit through the playground doors.

  - o PK-2nd will exit the elementary doors & 3rd-8th will exit through the gym lobby doors.

  - o 9th-12th will leave through the band hall doors (athletes will need to go through the playground to the locker rooms for after school practice).

  - o Parents are asked to stay in or near their vehicle upon picking up their students and practice social distancing.

- *Taking Temperature*

  - o Students will have their temperature taken prior to entering school transportation or the building (whichever comes first) and prior to lunch for elementary and junior high students, and prior to athletics for high school students.

  - o If a student has a temperature of 100.4 they will not be allowed on the bus or let in the building and if a student has 100.4 temperature while at school, they will be isolated and monitored by staff in designated areas until parents can come pick up their student.

- *Visitors to campus:*

  - o Visitors coming on campus through the main office doors and into the halls will be required to complete a Covid-19 screening form and have their temperature checked, be asked to sanitize hands and wear a face covering.

  - o Visitors are not allowed to come eat meals with students, and if a student has forgotten their lunch at home that morning, parents may bring that to the main office for delivery to the student.

  - o 7th-12th grade students who participate in open campus lunch are not allowed to bring outside food onto the campus.



# *02--Face Coverings*

*Our first priority is the safety of our students, employees, families, and surrounding community, and we strive to make the most responsible decisions to facilitate a safe environment for all. We would also like to emphasize that because of the fluid nature of this pandemic, CDC, state and local authority recommendations and mandates may be different on the first day of school than they are at the time of distribution of this information. We will adjust accordingly.*

*We believe it is wise to have every mitigation resource available, including face coverings, to use when appropriate or required. Face coverings will be defined as cloth masks, disposable masks, face shields, neck gaiters, bandanas, and handkerchiefs, that are used to cover both the nose and mouth.*

- Faculty, staff, and students are required to wear a face covering when entering and exiting the building, and during passing periods.

  o PK-2nd grade will be required to wear a face covering when entering or exiting the building.  Once in the classroom a face shield provided by the district will be worn during instruction time. Neck gaiters provided by the district will be worn during recess and PE time when students are in close contact.

  o 3rd-12th grade will be allowed to wear their own choice of face covering when entering or exiting the building, in the classroom, and during the passing periods. Neck gaiters provided by the district will be worn during recess, PE time, and athletics when students are in close contact. Students may be asked by their teachers at times to wear a face shield instead of a mask for educational purposes.

- We don't intend for the students to wear a face covering for the entire duration of a school day and faculty and staff will be looking for every opportunity to reduce the use of face coverings when other mitigating strategies can be met.

  For example:

  o Face coverings are **NOT** required to be worn in the classroom when 6ft of social distancing is available. (teacher discretion)

  o Face coverings are **NOT** required when students are outside and are able to maintain 6ft of social distancing. (teacher & coach discretion)

  o Face coverings are **NOT** required when eating breakfast & lunch.



# *03--Remote Learning Plan*

*We intend to operate in a 100% on site model for the entirety of the 2020-2021 school year. This plan is subject to change depending on state and federal mandates, but we are prepared to educate our students without interruption in any circumstance. In preparation for increased absences or family choice to not have your student in the building, we are prepared to deliver instruction to students remotely using technology that will allow students to participate and not fall behind but still be in accordance with TEA attendance guidelines.*

- Students who voluntarily participate in an all-remote instructional method, whether synchronous or asynchronous, shall not be permitted to participate in any extracurricular activity, practice, or performance for the grading period in which the student is receiving all-remote instruction.
- Students & parents will have a three week grace period from the first day of school to change from remote to in person learning.  After the three-week grace period, students will only be allowed to change only at the beginning of a new grading period.

*Here are the different remote learning options offered & training will be provided by the district for families on how to use the technology devices and learning platforms at home for remote learning. Students choosing the remote learning option must inform the district by Thursday, August 6th.*

- Synchronous ($3_{rd}$-$12_{th}$): defined as two way, real-time/live, virtual instruction between teachers and students when students are not on campus. In this method, the required amount of instructional time is scheduled each day and attendance is taken by each teacher daily.

  - 3rd-12th grade students will be required through an internet connection to login on their chromebooks to Google classroom and use Google meets to participate in each class (at the same time the class is being facilitated on campus).

  - Assignments and  assessments will be posted on Google classroom and students will be required to have a school-issued email address.

- Asynchronous (PK-$2_{nd}$): defined as instruction that does not require having the instructor and student engaged at the same time. In this method, students learn from instruction that is not being delivered in-person or in real time.

  - PK-$2_{nd}$ teachers will use a combination of online learning platforms, pre-recorded videos and packets to provide instruction, assignments, and assessments.



# *04--Cleaning Protocols*

*To reduce the transmission of Covid-19, JGISD has taken the following sanitation measures:*

- Protocols for periodic cleaning and disinfecting of shared surfaces and objects will be implemented throughout the day, both inside and outside the classroom.

- The use of water stations will be minimized. Students are asked to bring a water bottle each day labeled with the student's name.

- At the end of the day, students that wear district-issued face shields will return them to their homeroom teacher or 1st period teacher before they exit the building so they may be cleaned and sanitized by the staff.

- Students will be allowed to enjoy the use of the playground and PE equipment and cleaning protocols will be in place throughout the day to disinfect all the equipment used.



## <u>05-- *Distancing Guidelines & Supporting A Healthy Campus*</u>

*JGISD will provide the same in-person learning environment students and families have always enjoyed, with the following common-sense protocols in place:*

- Daily procedures have been adjusted to avoid congestion in common areas at the beginning and end of the day, as well as at lunch and recess.
- Desks and student seating will be spread out as much is reasonably possible as each classroom space allows. Teachers and staff will ensure students' maintain distance and reduce the shared use of materials.
- Lunch times will be staggered to assist in lessening congestion and social distance will be maintained between students during meal times while still allowing them the opportunity to sit together and have social interactions. Protocols will be implemented to reduce/prevent the handling of cups, utensils, and other supplies by multiple people.

*Keeping our campus open for learning will require cooperation and support from all of our families.  We know the Jaybird family community is up to the task and we are counting on you to do your part to support this process. Keeping your children at home when they are not feeling well is essential.*

- Any and all students, faculty, or staff should stay home from school or work if they 1) have tested positive for Covid-19; 2) had close contact with anyone confirmed to have Covid-19 in the prior 14 days; 3) are experiencing symptoms including but not limited to, cough, shortness of breath or difficulty breathing, feeling feverish or having a temperature of 100.4 degrees or more, chills, shaking or shivering, headache, loss of smell or taste, sore throat, significant muscle pain or diarrhea.
- JGISD will follow the most updated TEA, CDC, and local health authority guidelines to make decisions on a students' removal from and return to campus after experiencing multiple Covid-19 symptoms, and or testing positive for Covid-19.



# *06-- Partial Closures & Plan Review*

*In the event of an outbreak of COVID-19 cases at JGISD, we are prepared to follow CDC and local health officials guidance for a short term (2-5 day) closure of the school facility. If this occurs, we will continue to deliver content using the remote learning model we developed this year and will return to the classroom promptly after assessing the situation and taking appropriate measures to halt the spread.*

- We have an incredible staff who are ready to make this year a truly excellent experience for our entire community. We look forward to partnering with you and we will continue to evaluate our plan and reassess, as necessary, over the course of the next few weeks. We are praying for your family and we cannot wait to be together again on August 13th.

- As guidelines referring to Covid-19 and circumstances specific to our community are ever changing, we have selected three dates as part of our campus plan review. On each of these dates, we will evaluate and adjust our plan according to circumstances of our school, community, and state of Texas, as well as the guidelines in place at those times. We will use both local and regional authorities, and health officials in making these decisions. We will continue to add additional dates as necessary.

- Campus plan review dates:

    o September 4

    o September 25

    o October 16

- JGISD open house will be done virtually at a date and time to be determined.



# EXHIBIT 2B

Recording – Due to size constraints, the video is available from Petitioner's counsel upon request

# EXHIBIT 3

Executive Order GA-34

**EXHIBIT 3**



GOVERNOR GREG ABBOTT

March 2, 2021

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
____1:15 PM____O'CLOCK

MAR 2 2021

Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas  78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

Executive Order No. GA-34 relating to the opening of Texas in response to the COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

**EXHIBIT 3**

# 𝕰𝖝𝖊𝖈𝖚𝖙𝖎𝖛𝖊 𝕺𝖗𝖉𝖊𝖗

## BY THE
## GOVERNOR OF THE STATE OF TEXAS

### Executive Department
### Austin, Texas
### March 2, 2021

### EXECUTIVE ORDER
### GA 34

*Relating to the opening of Texas in response to the COVID-19 disaster.*

---

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, in each subsequent month effective through today, I have renewed the disaster declaration for all Texas counties; and

WHEREAS, I have issued executive orders and suspensions of Texas laws in response to COVID-19, aimed at protecting the health and safety of Texans and ensuring an effective response to this disaster; and

WHEREAS, I issued Executive Order GA-08 on March 19, 2020, mandating social-distancing restrictions in accordance with guidelines promulgated by President Donald J. Trump and the Centers for Disease Control and Prevention (CDC); and

WHEREAS, I subsequently issued a series of superseding executive orders aiming to achieve the least restrictive means of combatting the evolving threat to public health by adjusting social-distancing restrictions while implementing a safe, strategic plan to reopen Texas; and

WHEREAS, under Executive Order GA-32, in effect since October 14, 2020, most establishments have been able to operate up to at least 75 percent of total occupancy, except in some areas with high hospitalizations as defined in that order, where most establishments have been able to operate up to at least 50 percent of total occupancy; and

WHEREAS, I also issued Executive Order GA-29, regarding the use of face coverings to control the spread of COVID-19, and a series of executive orders, most recently GA-31, limiting certain medical surgeries and procedures; and

WHEREAS, COVID-19 hospitalizations and the rate of new COVID-19 cases have steadily declined due to the millions of Texans who have voluntarily been vaccinated, many more who are otherwise immune, improved medical treatments for COVID-19 patients, abundant supplies of testing and personal protective equipment, and Texans' adherence to safe practices like social distancing, hand sanitizing, and use of face coverings; and

WHEREAS, in the Texas Disaster Act of 1975, the legislature charged the governor with the responsibility "for meeting ... the dangers to the state and people presented by

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
1:15 ᵖᵐ O'CLOCK

MAR 0 2 2021

**EXHIBIT 3**

*Governor Greg Abbott*
March 2, 2021

*Executive Order GA-34*
Page 2

disasters" under Section 418.011 of the Texas Government Code, and expressly granted the governor broad authority to fulfill that responsibility; and

WHEREAS, under Section 418.012, the "governor may issue executive orders … hav[ing] the force and effect of law;"

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, and in accordance with guidance from medical advisors, do hereby order the following on a statewide basis effective at 12:01 a.m. on March 10, 2021:

1. In all counties not in an area with high hospitalizations as defined below:
    a. there are no COVID-19-related operating limits for any business or other establishment; and
    b. individuals are strongly encouraged to wear face coverings over the nose and mouth wherever it is not feasible to maintain six feet of social distancing from another person not in the same household, but no person may be required by any jurisdiction to wear or to mandate the wearing of a face covering.

   "Area with high hospitalizations" means any Trauma Service Area that has had seven consecutive days in which the number of COVID-19 hospitalized patients as a percentage of total hospital capacity exceeds 15 percent, until such time as the Trauma Service Area has seven consecutive days in which the number of COVID-19 hospitalized patients as a percentage of total hospital capacity is 15 percent or less. A current list of areas with high hospitalizations will be maintained at www.dshs.texas.gov/ga3031.

2. In any county located in an area with high hospitalizations as defined above:
    a. there are no state-imposed COVID-19-related operating limits for any business or other establishment;
    b. there is no state-imposed requirement to wear a face covering; and
    c. the county judge may use COVID-19-related mitigation strategies; *provided, however, that*:
        i. business and other establishments may not be required to operate at less than 50 percent of total occupancy, with no operating limits allowed to be imposed for religious services (including those conducted in churches, congregations, and houses of worship), public and private schools and institutions of higher education, and child-care services;
        ii. no jurisdiction may impose confinement in jail as a penalty for violating any order issued in response to COVID-19; and
        iii. no jurisdiction may impose a penalty of any kind for failure to wear a face covering or failure to mandate that customers or employees wear face coverings, except that a legally authorized official may act to enforce trespassing laws and remove violators at the request of a business establishment or other property owner.

3. In providing or obtaining services, every person (including individuals, businesses, and other legal entities) is strongly encouraged to use good-faith efforts and available resources to follow the Texas Department of State Health Services (DSHS) health recommendations, found at www.dshs.texas.gov/coronavirus.

4. Nothing in this executive order precludes businesses or other establishments from requiring employees or customers to follow additional hygiene measures, including the wearing of a face covering.

5. Nursing homes, state supported living centers, assisted living facilities, and long-

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
1:15 PM  O'CLOCK

MAR 0 2 2021

*Governor Greg Abbott*  
March 2, 2021

*Executive Order GA-34*  
Page 3

term care facilities should follow guidance from the Texas Health and Human Services Commission (HHSC) regarding visitations, and should follow infection control policies and practices set forth by HHSC, including minimizing the movement of staff between facilities whenever possible.

6. Public schools may operate as provided by, and under the minimum standard health protocols found in, guidance issued by the Texas Education Agency. Private schools and institutions of higher education are encouraged to establish similar standards.

7. County and municipal jails should follow guidance from the Texas Commission on Jail Standards regarding visitations.

8. Executive Orders GA-17, GA-25, GA-29, and GA-31 are rescinded in their entirety.

9. This executive order shall supersede any conflicting order issued by local officials in response to the COVID-19 disaster, but only to the extent that such a local order restricts services allowed by this executive order or allows gatherings restricted by this executive order. Pursuant to Section 418.016(a) of the Texas Government Code, I hereby suspend Sections 418.1015(b) and 418.108 of the Texas Government Code, Chapter 81, Subchapter E of the Texas Health and Safety Code, and any other relevant statutes, to the extent necessary to ensure that local officials do not impose restrictions in response to the COVID-19 disaster that are inconsistent with this executive order, provided that local officials may enforce this executive order as well as local restrictions that are consistent with this executive order.

10. All existing state executive orders relating to COVID-19 are amended to eliminate confinement in jail as an available penalty for violating the executive orders. To the extent any order issued by local officials in response to the COVID-19 disaster would allow confinement in jail as an available penalty for violating a COVID-19-related order, that order allowing confinement in jail is superseded, and I hereby suspend all relevant laws to the extent necessary to ensure that local officials do not confine people in jail for violating any executive order or local order issued in response to the COVID-19 disaster.

This executive order supersedes Executive Orders GA-17, GA-25, GA-29, GA-31, and GA-32, but does not supersede Executive Orders GA-10 or GA-13. This executive order shall remain in effect and in full force unless it is modified, amended, rescinded, or superseded by the governor. This executive order may also be amended by proclamation of the governor.

Given under my hand this the 2nd day of March, 2021.

GREG ABBOTT  
Governor

FILED IN THE OFFICE OF THE  
SECRETARY OF STATE  
1:15pm O'CLOCK

MAR 0 2 2021

**EXHIBIT 3**

*Governor Greg Abbott*
March 2, 2021

*Executive Order GA-34*
Page 4

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
1:15PM   O'CLOCK

MAR 0 2 2021

# EXHIBIT 4

Executive Order GA-29

**EXHIBIT 4**



GOVERNOR GREG ABBOTT

July 2, 2020

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30 ___ O'CLOCK

_____
Secretary of State

The Honorable Ruth R. Hughs
Secretary of State
State Capitol Room 1E.8
Austin, Texas 78701

Dear Secretary Hughs:

Pursuant to his powers as Governor of the State of Texas, Greg Abbott has issued the following:

Executive Order No. GA-29 relating to the use of face coverings during the
COVID-19 disaster.

The original executive order is attached to this letter of transmittal.

Respectfully submitted,

Gregory S. Davidson
Executive Clerk to the Governor

GSD/gsd

Attachment

EXHIBIT 4

# 𝔈𝔵𝔢𝔠𝔲𝔱𝔦𝔳𝔢 𝔒𝔯𝔡𝔢𝔯

## BY THE
## GOVERNOR OF THE STATE OF TEXAS

### Executive Department
### Austin, Texas
### July 2, 2020

### EXECUTIVE ORDER
### GA 29

*Relating to the use of face coverings during the COVID-19 disaster.*

════════════════════════

WHEREAS, I, Greg Abbott, Governor of Texas, issued a disaster proclamation on March 13, 2020, certifying under Section 418.014 of the Texas Government Code that the novel coronavirus (COVID-19) poses an imminent threat of disaster for all counties in the State of Texas; and

WHEREAS, in each subsequent month effective through today, I have renewed the disaster declaration for all Texas counties; and

WHEREAS, the Commissioner of the Texas Department of State Health Services (DSHS), Dr. John Hellerstedt, has determined that COVID-19 continues to represent a public health disaster within the meaning of Chapter 81 of the Texas Health and Safety Code; and

WHEREAS, I have issued executive orders and suspensions of Texas laws in response to COVID-19, aimed at using the least restrictive means available to protect the health and safety of Texans and ensure an effective response to this disaster; and

WHEREAS, as Texas reopens in the midst of COVID-19, increased spread is to be expected, and the key to controlling the spread and keeping Texans safe is for all people to consistently follow good hygiene and social-distancing practices; and

WHEREAS, due to recent substantial increases in COVID-19 positive cases, and increases in the COVID-19 positivity rate and hospitalizations resulting from COVID-19, further measures are needed to achieve the least restrictive means for reducing the growing spread of COVID-19, and to avoid a need for more extreme measures; and

WHEREAS, I have joined the medical experts in consistently encouraging people to use face coverings, and health authorities have repeatedly emphasized that wearing face coverings is one of the most important and effective tools for reducing the spread of COVID-19; and

WHEREAS, given the current status of COVID-19 in Texas, requiring the use of face coverings is a targeted response that can combat the threat to public health using the least restrictive means, and if people follow this requirement, more extreme measures may be avoided; and

WHEREAS, wearing a face covering is important not only to protect oneself, but also to avoid unknowingly harming fellow Texans, especially given that many people who go into public may have COVID-19 without knowing it because they have no symptoms; and

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30pm O'CLOCK

JUL 0 2 2020

WHEREAS, the "governor is responsible for meeting … the dangers to the state and people presented by disasters" under Section 418.011 of the Texas Government Code, and the legislature has given the governor broad authority to fulfill that responsibility; and

WHEREAS, failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable under Section 418.173 by fine;

NOW, THEREFORE, I, Greg Abbott, Governor of Texas, by virtue of the power and authority vested in me by the Constitution and laws of the State of Texas, do hereby order the following on a statewide basis effective at 12:01 p.m. on July 3, 2020:

Every person in Texas shall wear a face covering over the nose and mouth when inside a commercial entity or other building or space open to the public, or when in an outdoor public space, wherever it is not feasible to maintain six feet of social distancing from another person not in the same household; *provided, however, that this face-covering requirement does not apply to the following*:

1. any person younger than 10 years of age;

2. any person with a medical condition or disability that prevents wearing a face covering;

3. any person while the person is consuming food or drink, or is seated at a restaurant to eat or drink;

4. any person while the person is (a) exercising outdoors or engaging in physical activity outdoors, and (b) maintaining a safe distance from other people not in the same household;

5. any person while the person is driving alone or with passengers who are part of the same household as the driver;

6. any person obtaining a service that requires temporary removal of the face covering for security surveillance, screening, or a need for specific access to the face, such as while visiting a bank or while obtaining a personal-care service involving the face, but only to the extent necessary for the temporary removal;

7. any person while the person is in a swimming pool, lake, or similar body of water;

8. any person who is voting, assisting a voter, serving as a poll watcher, or actively administering an election, but wearing a face covering is strongly encouraged;

9. any person who is actively providing or obtaining access to religious worship, but wearing a face covering is strongly encouraged;

10. any person while the person is giving a speech for a broadcast or to an audience; or

11. any person in a county (a) that meets the requisite criteria promulgated by

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
2:30pm O'CLOCK

JUL 0 2 2020

**EXHIBIT 4**

*Governor Greg Abbott*                                    *Executive Order GA-29*
July 2, 2020                                                           Page 3

the Texas Division of Emergency Management (TDEM) regarding minimal cases of COVID-19, and (b) whose county judge has affirmatively opted-out of this face-covering requirement by filing with TDEM the required face-covering attestation form—provided, however, that wearing a face covering is highly recommended, and every county is strongly encouraged to follow these face-covering standards.

Not excepted from this face-covering requirement is any person attending a protest or demonstration involving more than 10 people and who is not practicing safe social distancing of six feet from other people not in the same household.

TDEM shall maintain on its website a list of counties that are not subject to this face-covering requirement pursuant to paragraph number 11. The list can be found at: www.tdem.texas.gov/ga29.

Following a verbal or written warning for a first-time violator of this face-covering requirement, a person's second violation shall be punishable by a fine not to exceed $250. Each subsequent violation shall be punishable by a fine not to exceed $250 per violation.

Local law enforcement and other local officials, as appropriate, can and should enforce this executive order, Executive Order GA-28, and other effective executive orders, as well as local restrictions that are consistent with this executive order and other effective executive orders. But no law enforcement or other official may detain, arrest, or confine in jail any person for a violation of this executive order or for related non-violent, non-felony offenses that are predicated on a violation of this executive order; provided, however, that any official with authority to enforce this executive order may act to enforce trespassing laws and remove violators at the request of a business establishment or other property owner.

This executive order hereby prohibits confinement in jail as a penalty for the violation of any face-covering order by any jurisdiction.

Executive Order GA-28 is hereby amended to delete from paragraph number 15 the phrase: ", but no jurisdiction can impose a civil or criminal penalty for failure to wear a face covering."

The governor may by proclamation amend this executive order or add to the list of people to whom this face-covering requirement does not apply.

This executive order does not supersede Executive Orders GA-10, GA-13, GA-17, GA-19, GA-24, GA-25, GA-27, or GA-28 as amended. This executive order shall remain in effect and in full force until modified, amended, rescinded, or superseded by the governor.

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
___2:30 Pm___ O'CLOCK

JUL 0 2 2020

*Governor Greg Abbott*
July 2, 2020

*Executive Order GA-29*
Page 4



Given under my hand this the 2nd
day of July, 2020.

GREG ABBOTT
Governor

ATTESTED BY:

RUTH R. HUGHS
Secretary of State

FILED IN THE OFFICE OF THE
SECRETARY OF STATE
_2:30pm_ O'CLOCK

JUL 0 2 2020

# EXHIBIT 5

Jayton-Girard Independent School District - April 20, 2021 - Schoolboard Minutes

**EXHIBIT 5**

The board of Trustees of the Jayton-Girard Independent School District met in regular session on April 20, 2021, with the following members present: to wit:

Amanda McGee – President

| Jeff Arnold | Connie Martinez |
| L'Rae Lee | Cody Stanaland |
| B.J. Baldridge | |

**School Officials Present**: Johnny Tubb- Interim Superintendent, Lyle Lackey-Principal, Laci Scogin-Business Manager, Roger Smetak-Network Admin

**Visitors Present and their comments:** Layne Sheets

And the following members absent: Cole Carpenter

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order by Amanda McGee at 7:02 pm.

Principal's report included student success highlights, Big Event on April 28th, regional and state competitions, testing, rocket launching, and property survey.

Superintendent's report included accident report, 15-passenger van update, school housing update, main sewer line south of school, construction update.

Board President, Amanda McGee, called for closed session for personnel discussion at 7:06 pm. Returned to regular session at 7:22 pm.

Motion made by Jeff Arnold, seconded by Cody Stanaland to approve contract offering as Superintendent of Schools for the 2021-2022, 2022-2023, 2023-2024 school years for Layne Sheets. All in favor.

Minutes from March 22, 2021 Regular Meeting, March 23, 2021 Called Meeting, and March 29, 2021 Called Meeting were presented. Motion made by Cody Stanaland, seconded by B.J. Baldridge to approve the minutes as presented. All in favor.

The bills and financial report were presented. Motion made by Connie Martinez, seconded by B.J. Baldridge to approve and pay bills as presented. All in favor.

Motion made by Jeff Arnold, seconded by Cody Stanaland to approve budget amendments as presented. All in favor.

Motion made by Cody Stanaland, seconded by B.J. Baldridge to request for County Permanent School Funds in the amount of $367,792.31 for capital improvements. All in favor.

Motion made by Jeff Arnold, seconded by B.J. Baldridge to approve the amendment of the Child Care Center in the amount of $40,000.00. All in favor.

Preliminary budget projections were presented and discussed for 2021-2022 and 2022-2023 and no action was taken.

Motion made by Connie Martinez, seconded by Jeff Arnold to approve the purchase of the DW 3U Rack NVR (I-70 4MP), (10 Bay) i9 with 120 gig Solid State OS Drive Win 10 Pro with 9:12TB storage drives which is over $10,000. All in favor.

Motion made by B.J. Baldridge, seconded by L'Rae Lee to approve the resolution extending depository contract for

**EXHIBIT 5**

funds.  5-for, Amanda-Abstained.

Information given to board about Summer Leadership Institute. No action taken.

Board President, Amanda McGee, called for closed session for attorney consult at 8:53 pm.  Returned to regular session at 9:31 pm.

Motion made by Cody Stanaland, seconded by Jeff Arnold to approve COVID policies and procedures as recommended by Committee and administration.  All in favor.

Called Meeting to canvas school board election votes on May 6th at 12:00 pm.  Regular board meeting date is set for May 17, 2021 at 8:00 pm.

Motion made by Connie Martinez, seconded by B.J. Baldridge to adjourn the meeting.  All in favor.

Meeting adjourned at 9:40 pm.


_____          _____
President                                              Secretary

# EXHIBIT 6

Jayton-Girard Independent School District - Schoolboard Minutes

The board of Trustees of the Jayton-Girard Independent School District met on March 26, 2020, for Regular Session with the following members present to wit:

Kathy Owen-President

| | |
|---|---|
| B.J. Baldridge | Connie Martinez |
| L'Rae Lee | Cody Stanaland |
| Cole Carpenter | Amanda McGee |

**School Officials Present**: Trig Overbo-Superintendent, Lyle Lackey-Principal, Laci Scogin-Business Manager, Roger Smetak-Network Admin

**Visitors Present and their comments**: None

And the following members absent:

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order at 7:00 pm.

The Superintendent reported on the construction update for daycare/gym, front entrance, and roofing project.

Minutes from the February 20, 2020 Regular Meeting, March 2, 2020 Called Meeting, and March 18, 2020 Emergency Meeting were presented. Motion made by Cody Stanaland, seconded by Cole Carpenter to approve the minutes as presented.  All in favor.

The bills were presented.  Motion made by Amanda McGee, seconded by Cody Stanaland to approve the payment of bills as presented.  All in favor.

No action was taken on construction.

Motion made by Connie Martinez, seconded by Cody Stanaland to request for County Permanent School Funds in the amount of $252,466.11 for capital improvements.  All in favor.

Motion made to allow the superintendent to make decisions relating to emergency modifications due to COVID-19.
- Consideration and action on a resolution delegating to the superintendent authority to make emergency modifications to District policies as needed, including without limit, closure of schools, arranging instruction via distance/virtual learning platforms, and the expenditure of public funds arising from the Governor declared State of Disaster and to mitigate public health risks during the COVID-19 worldwide pandemic.

6 in favor, 1 against – (for: Kathy Owen, Connie Martinez, Cole Carpenter, B.J. Baldridge, L'Rae Lee, Cody Stanaland Against: Amanda McGee)

Bids were considered for school houses.  Motion made by B.J. Baldridge and seconded by Cody Stanaland to accept the bid as presented from Hindman Ready Built Homes.  All in favor.

No action taken on District of Innovation Amendment.

Motion made by B.J. Baldridge and seconded by Cody Stanaland to adopt goals as presented and during the June Board Meeting visit each goal and list areas we want to measure and evaluate.  All in favor.

Motion was made by Cody Stanaland, seconded by Connie Martinez to enter into closed session.  All in favor. Time in 8:20pm.

Motion made by Cody Stanaland, seconded by Amanda McGee to return to regular session.  All in favor. Time out 10:24pm

Next board Meeting set for April 23, 2020 at 7pm.

Motion made to adjourn the meeting by Connie Martinez, seconded by Amanda McGee.  All in favor

Meeting adjourned at 10:29pm.

_____          _____
President                                               Secretary

The board of Trustees of the Jayton-Girard Independent School District met in regular session on April 16, 2020, with the following members present: to wit:

Kathy Owen – President

Amanda McGee                                              Connie Martinez
L'Rae Lee                                                       Cody Stanaland (arrived at 7:13)
B.J. Baldridge (remote)

**School Officials Present**: Trig Overbo-Superintendent, Lyle Lackey-Principal (remote), Laci Scogin-Business Manager (remote), Roger Smetak-Network Admin

**Visitors Present and their comments:** John Cox-presentation about Robotics, Briana Sturgis-The Texas Spur

And the following members absent: Cole Carpenter

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order by Kathy Owen at 7:00 pm.

Principal's report included distance learning, continuing with numeric grades, adjusting teacher schedules, moving towards all electronic distribution of work, weekly virtual staff meetings, will be contacting each student/parent next week and looking at all options for graduation.

Superintendent's report included Summer Leadership Institute still scheduled and rooms are book for June 24th-27th, press conference from Governor tomorrow on where we go on opening or remain closed, COVID-19, and school funding update after meeting next week.  Construction-paving and tennis court pricing will be in on April 28th.  Entrance-flooring replacement, south wall and concrete work next week.  Roof-Surface complete on roof, working on metal and skylights.  Daycare- dirt work begins Monday.

Minutes from February 22, 2020 Regular Meeting were presented.  Motion made by Amanda McGee, seconded by Connie Martinez to approve the minutes as presented.  All in favor.

The bills and financial report were presented.  Motion made by Amanda McGee, seconded by Cody Stanaland to approve and pay bills as presented.  All in favor.

Motion made by L'Rae Lee, seconded by Cody Stanaland to approve budget amendments as presented.  All in favor.

Motion made by Cody Stanaland, seconded by Amanda McGee to request for County Permanent School Funds in the amount of $78,320.59 for capital improvements.  All in favor.

Motion made by Connie Martinez, seconded by Cody Stanaland to approve order to postpone the May 2, 2020 School Board Election until the November uniform election date. All in favor.

No action taken on presentation by John Cox.

Motion made by Cody Stanaland, seconded by Amanda McGee to enter into closed session at 8:25 pm for personnel.  All in favor.

Motion made by Amanda McGee, seconded by Connie Martinez to return to regular session at 10:32pm.  All in favor.

Motion made by Amanda McGee, seconded by Connie Martinez to offer contracts to the list as amended.  All in favor.

The next board meeting date was set for May 14, 2020 at 7:00.

Motion made by Connie Martinez, seconded by Amanda McGee to adjourn the meeting.  All in favor.

Meeting adjourned at 10:33 pm.


_____          _____
President                                        Secretary

The board of Trustees of the Jayton-Girard Independent School District met in regular session on June 18, 2020, with the following members present: to wit:

Amanda McGee-President

Kathy Owen                                              Connie Martinez
B.J. Baldridge                                          L'Rae Lee


**School Officials Present**: Trig Overbo-Superintendent, Lyle Lackey-Principal, Laci Scogin-Business Manager

**Visitors Present and their comments:**

And the following members absent: Cole Carpenter and Cody Stanaland

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order by President Amanda McGee at 7:02 pm.

Principal's report included scheduling, curriculum, summer training, Chromebook vs iPads, summer workouts, and Scholastic Network.

Superintendent's report included library relocation and surplus books, school housing repairs, school calendar, begin COVID-19 protocol talks, front entrance, day care/gym, paving, tennis courts, and school housing.

Minutes from the May 14, 2020 Regular Meeting and the June 1, 2020 Called Meeting were presented. Motion made by Kathy Owen, seconded by Connie Martinez to approve the minutes.  All in favor.

The bills and financial report were presented.  Motion made by L'Rae Lee, seconded by B.J. Baldridge to approve the bills as presented.  All in favor.

Motion made by B.J. Baldridge, seconded by Connie Martinez to call for vehicle fuel and propane bids and to call for vendors for Personal Property valued between $10,000 and $25,000 for the 2020-2021 fiscal year.  All in favor.

Motion made by Connie Martinez, seconded by B.J. Baldridge to approve the annual review of Investment Policies and Procedures as presented.  All in favor.

Motion made by Kathy Owen, seconded by Connie Martinez to name Laci Scogin as the Investment Officer for Jayton-Girard ISD. All in favor.

Motion made by B.J. Baldridge, seconded by Kathy Owen to approve the request for County Permanent School Funds in the amount of $348,063.22 for capital improvements.  All in favor.

No action taken on Depository Contract Extension with Bank of Texas.  Current contract in effect until August 31, 2021.

Motion made by L'Rae Lee, seconded by B.J. Baldridge to approve missed school day waiver as presented.  All in favor.

Motion made by Kathy Owen, seconded by B.J. Baldridge to accept bid from White River Youth Camp in the amount of $2,200 for the house located at 601 Jefferson pending proof of bond and insurance.  All in favor.

No action taken on Fund Balance Designation.

Next board meeting: July 21, 2020 at 7:00pm

Motion made by Connie Martinez, seconded by B.J. Baldridge to adjourn the meeting.  All in favor.

Meeting adjourned at 8:08 pm.

_____                    _____
President                                                        Secretary

The board of Trustees of the Jayton-Girard Independent School District met in regular session on October 19, 2020, with the following members present to wit:

Amanda McGee-President

| | |
|---|---|
| Kathy Owen | Connie Martinez |
| Cody Stanaland | B.J. Baldridge |
| Cole Carpenter | L'Rae Lee |

**School Officials Present**: Trig Overbo-Superintendent, Lyle Lackey-Principal, Laci Scogin-Business Manager

**Visitors Present and their comments:**  Robert Cameron with BGR Architects-Construction updates-childcare/gym going well, paving tennis courts moving forward, and stadium seating options.

And the following members absent:

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order by President Amanda McGee at 7:00pm.

Principal's report included COVID procedures and plans, 1st-4th grade program, "Yee Haw", enrollment of 177, highlights, football, cross country, UIL Congress, and upcoming events.

Superintendent's report included plumbing issues by gym and LED lights in the auditorium.

Minutes from the September 22, 2020 regular meeting were presented. Motion made by B.J. Baldridge, seconded by Cody Stanaland to approve the minutes as presented.  All in favor.

The bills and financial report were presented.  Motion made by Kathy Owen, seconded by Connie Martinez to approve the bills as presented.  All in favor.

Motion made by Cody Stanaland and seconded by L'Rae Lee to nominate and appoint B.J. Baldridge and Connie Martinez to the Appraisal District Board.  All in favor.

Motion made by Connie Martinez, seconded by Kathy Owen to approve request for County Permanent School Funds in the amount of $1,258,047.50 for capital improvements.  All in favor.

Discussion on assignment of fund balance money.  No action taken.

Motion made by Cody Stanaland, seconded by Cole Carpenter to approve fuel tank bid as presented from Hughes Tank Company.  All in favor.

No action taken on concrete for school houses.  Will wait for next meeting in order to obtain more quotes.

Motion made by Cody Stanaland, seconded by Cole Carpenter to approve quote as presented from SAB Construction for fencing for the new school houses.  All in favor.

Motion made by Cody Stanaland, seconded by Connie Martinez to approve the quote as presented from Daktronics for two new scoreboards for the new gym.  All in favor.

Next Meeting will be November 23, 2020 at 7:00 pm

Motion made by Connie Martinez, seconded by Cole Carpenter to adjourn the meeting.  All in favor.

Meeting adjourned at 9:06 pm.


_____          _____
President                                                    Secretary

The board of Trustees of the Jayton-Girard Independent School District met in regular session on November 16, 2020, with the following members present: to wit:

Amanda McGee (Remote)

Connie Martinez                                                 L'Rae Lee (Remote)
Cole Carpenter                                                   Cody Stanaland (Remote)
B.J. Baldridge                                                    Jeff Arnold

**School Officials Present**: Trig Overbo-Superintendent, Lyle Lackey-Principal, Laci Scogin-Business Manager (Remote), Roger Smetak-Network Administrator, Kelsi Stanaland-Administrative Assistant

**Visitors Present and their comments:**

And the following members absent:

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order by Vice President B.J. Baldridge at 7:43 pm.

Motion made by Connie Martinez, seconded by Cole Carpenter to certify the results of the November 3, 2020 Trustee Election as canvassed and official. All in favor.

Jeff Arnold was sworn in by Kelsi Stanaland.

Principal's report included COVID updates, virtual learning and teaching, playoffs, basketball NFHS, JH OAP, Area Ag Contest at Anson, Elementary and JH UIL, and Christmas band concert.

Superintendent's report included COVID "score", construction meeting on Thursday, tennis courts have been poured, daycare building is moving well, school housing-first house arriving next week.

No action taken on Robert Stewart-Penalty and Interest Taxes.

Minutes from the October 19, 2020 Public Hearing and Regular Meeting were presented.  Motion made by Connie Martinez, seconded by Cole Carpenter to approve the minutes as presented.  All in favor.

The bills and financial report were presented.  Motion made by L'Rae Lee, seconded by Cole Carpenter to approve the bills as presented.  All in favor.

Motion made by Connie Martinez, seconded by Cole Carpenter to approve the West Texas Food Service Cooperative Interlocal Agreement as presented. All in favor.

Motion made by Connie Martinez, seconded by Jeff Arnold to approve request for County Permanent School Funds in the amount of $229,518.10 for capital improvements.  All in favor.

Motion made by L'Rae Lee and seconded by Cody Stanaland to approve the quote from Child's Play, Inc for the daycare playground as presented.  All in favor.

Motion made by Cole Carpenter, seconded by Cody Stanaland to approve the quote from Fraser Concrete as presented for the new school houses.  All in favor.

No action taken for Evaluations and Improving Student Outcomes Training.  Will try to schedule for December 15, 2020.

No action taken of Educational Foundation.  Discussion only and will revisit soon.

No action taken on considering patio roofs for new school houses.  Cole Carpenter and Cody Stanaland will donate their

time to show our ag students, along with Mr. Hernandez, how to construct patios.

Next Board Meeting: December 15, 2020.  Time to be decided after scheduling board training.

Motion made by Connie Martinez, seconded by B.J. Baldridge to adjourn the meeting.  All in favor.

Meeting adjourned at 9:21 pm.


_____          _____
President                                              Secretary

The board of Trustees of Jayton-Girard Independent School District met in Regular Session on December 15, 2020, with the following members present to wit:

| | |
|---|---|
| L'Rae Lee | B.J. Baldridge |
| Connie Martinez | Cody Stanaland |
| Cole Carpenter | Jeff Arnold |

**School Officials Present**: Trig Overbo-Superintendent, Roger Smetak- Network Administrator, Laci Scogin-Business Manager

**Visitors Present and their comments**:

And the following members absent: Amanda McGee

Constituting a quorum and among other proceeding had by said Board of Trustees, were the following:

Meeting called to order by Vice-President B.J. Baldridge at 8:43 pm.

Superintendent's Report included Solar Nova 1, COVID update, School housing-electricity, water, and third house arriving after the new year, daycare-roofing in progress, measuring for windows, and cabinets, tennis court-dirt work, lighting, and fence work, shot put ring staked out, stadium survey, and secondary science.

Minutes from the November 16, 2020 Regular Meeting were presented. Motion made by Connie Martinez, seconded by Jeff Arnold to approve the minutes as presented.  All in favor.

The bills and financial report were presented. Motion made by Cody Stanaland, seconded by Connie Martinez to approve the bills as presented. All in favor.

Motion made by L'Rae Lee, seconded by Connie Martinez to table reorganization of board positions until next meeting. All in favor.

Board training hours were presented.  Motion made by Connie Martinez, seconded by Cody Stanaland to approve training hours as presented.  All in favor.

Motion made by Cody Stanaland, seconded by Cole Carpenter to approve the Superintendent's Evaluation Instrument as presented. All in favor.

Motion made by Cody Stanaland, seconded by Jeff Arnold to approve request for County Permanent School Funds in the amount of $1,399,256.18 for capital improvements.  All in favor.

Motion made by Cole Carpenter, seconded by Cody Stanaland to approve easement and right of way agreement with AEP as presented.  All in favor.

Next meeting set for January 21, 2021 at 7pm.

Motion made by Connie Martinez, seconded by Cody Stanaland to adjourn the meeting. All in favor.

Meeting adjourned at 10:19 pm.

_____                    _____
President                                                                          Secretary

The board of Trustees of Jayton-Girard Independent School District met in Regular Session on January 21, 2021, with the following members present to wit:

Amanda McGee-President

| | |
|---|---|
| Connie Martinez | Cody Stanaland |
| B.J. Baldridge | L'Rae Lee |
| Cole Carpenter | Jeff Arnold |

School Officials Present: Trig Overbo-Superintendent, Lyle Lackey- Principal, Roger Smetak- Network Administrator, Laci Scogin-Business Manager

Visitors Present: Kim Bairrington-Audit Report, Lance Spray-Superintendent leaving and Lackey Recommendation, Mark Holcomb and Phil Warren-ESC 17 Superintendent Search Presentation

And the following members absent:

Constituting a quorum and among other proceeding had by said Board of Trustees, were the following:

Meeting called to order by President Amanda McGee at 7:01 pm.

Principal's report included enrollment, COVID procedures and committee meeting, basketball gate procedures, NFHS Network for community viewing of games, stock shows, OAP, ag mech team, robotics team, little dribblers, benchmark and TPRI testing, 100th day of school is January 26th.

Superintendent's report included construction updates, housing, tennis courts, daycare/gym, football stadium discussion.

Audit report by Kim Bairrington from Newberry, Leonard, Horton, and Bairrington was presented.  Motion made by Connie Martinez, seconded by B.J. Baldridge to approve audit as presented.  All in favor.

Motion made by Cody Stanaland, seconded by L'Rae Lee to leave Amanda McGee as president.  All in favor. Motion made by L'Rae Lee, seconded by Connie Martinez to leave B.J. Baldridge as vice president.  All in favor. Motion made by Connie Martinez, seconded by Cody Stanaland to leave L'Rae Lee as the secretary.  All in favor.

Minutes from the December 15, 2020 called and regular meetings were presented. Motion made by Cody Stanaland, seconded by Connie Martinez to approve the minutes as presented.  January 4, 2021 called meeting minutes will be presented at next meeting. All in favor.

The bills and financial report were presented. Motion made by B.J. Baldridge, seconded by Cody Stanaland to approve the bills as presented. All in favor.

Motion made by Connie Martinez to call for Trustee Election for May 1, 2021. Seconded by Cole Carpenter.  All in favor.

Motion made by Connie Martinez, seconded by B.J. Baldridge to approve the consideration and action on an Election Services Contract with Kent County, Texas.  All in favor.

Motion made by Connie Martinez, seconded by Cody Stanaland to approve the consideration and action on a Joint Election Agreement with the City of Jayton.   All in favor.

Motion was made by Cody Stanaland, seconded by Cole Carpenter to request for County Permanent School Funds in the amount of 1,066,384.82 for capital improvements. All in favor.

Motion made by Connie Martinez, seconded by Cody Stanaland to approve the HB3 student outcome goals for 2021 as presented.  All in favor.

Motion made by B.J. Baldridge, seconded by Jeff Arnold to approve TASB updates 115 and 116 as presented. All in favor.

Motion made by Jeff Arnold, seconded by Cole Carpenter to enter into a MOU with ESC 17 for superintendent search.

Motion made by B.J. Baldridge, seconded by Connie Martinez to enter into closed session at 9:19 pm.  All in favor.  Returned from closed session at 10:22 pm.

Next board meeting is set for February 22, 2021 at 7:00 pm.

Motion made by Connie Martinez, seconded by Cole Carpenter to adjourn the meeting.  All in favor.

Meeting adjourned at 10:22 pm.


_____                    _____
President                                                          Secretary

The board of Trustees of the Jayton-Girard Independent School District met in Called Meeting on March 10, 2021, with the following members present: to wit:

Amanda McGee

Cody Stanaland                                             L'Rae Lee
B.J. Baldridge                                             Cole Carpenter
Jeff Arnold (Zoom)

**School Officials Present**: Trig Overbo-Superintendent (Zoom), Laci Scogin-Business Manager, Roger Smetak-Network Admin

**Visitors Present and their comments:**  Wayne Blount and Phil Warren-ESC 17 for Superintendent Search, Johnny Tubb-Interim Superintendent, Clint Long-Mask/COVID

And the following members absent: Connie Martinez

Constituting a quorum and among other proceedings had by said Board of Trustees, were the following:

Meeting called to order by President Amanda McGee at 1:02 pm.

Motion made by Cody Stanaland, seconded by B.J. Baldridge to allow Ashley and Alberic Overbo to stay in school housing free of charge.  All in favor.

Motion made by Cody Stanaland, seconded by B.J. Baldridge to continue current COVID-19 procedures that are in place. Five-for, Cole Carpenter-against.

Motion made by B.J. Baldridge, seconded by Cole Carpenter to enter into closed session at 1:36 pm.  All in favor. Exited at 6:04 pm.

Motion made by Cody Stanaland, seconded by Cole Carpenter to adjourn the meeting.  All in favor.

Meeting adjourned at 6:05 pm.


_____                    _____
President                                             Secretary

# EXHIBIT 7

School Photos



**Double J Chronicles**

3m · 🌐

 ... See More

🔴🔴 Justin Boyd Gibson and 4 others

 Like          💬 Comment          ➤ Share





































Double J Chronicles
Oct 30, 2020 · 🌐

🔵 Mickey Alexander and 1 other

 Like　　　 Comment　　　 Share



**Double J Chronicles**
Oct 30, 2020 · 🌐

⬤⬤ Cassie Valerio and 4 others





👍 Like       💬 Comment       ➤ Share



Double J Chronicles
Oct 30, 2020



 Cassie Valerie and 17 others          3 Comments

👍 Like          💬 Comment          ↪ Share











Double J Chronicles
Feb 26 · 







